Walter H. Long v. Johnson County Telephone Company, Appellant.

**Master and servant:** NEGLIGENCE OF MASTER: EVIDENCE. Under the
1 evidence the question of whether defendant's foreman was negligent in directing plaintiff to remove a cross arm from one of its telephone poles without advising him of a possible danger, unknown to plaintiff but which the foreman might reasonably have known, that the pole would spring when the cross arm was removed, was for the jury.

**Instructions:** REFUSAL. It is not erroneous to refuse instructions
2 which would have lead to a different verdict when the evidence supports the verdict as rendered.

Safe place to work: LIABILITY OF MASTER. Where the unsafety of a place at which an employé is directed to work does not arise from an act of his but from a previous condition known only to the master, which rendered the place unsafe, the rule that the master is relieved of the duty to furnish a safe place where it becomes unsafe during the progress of the work, has no application.

Safe place to work: WARNING: CARE. In the exercise of ordinary care the master is bound to warn a servant against danger which he has reason to believe is likely to occur upon the happening of a certain contingency, and of which the servant has no knowledge.

*Appeal from Linn District Court.*— HON. J. H. PRESTON, Judge.

FRIDAY, MAY 17, 1907.

ACTION to recover damages for personal injuries received by the plaintiff while in the employ of defendant as lineman, and alleged to have resulted from the negligence of defendant in not advising plaintiff of danger involved in the particular operation in which he was engaged. Verdict and judgment for plaintiff. Defendant appeals.— *Affirmed.*

*Dawley, Hubbard & Wheeler,* for appellant.

*J. M. Dower* and *Rickel, Crocker & Tourtellot,* for appellee.

McCLAIN, J.— It appears that the plaintiff was an experienced lineman, who at the time of the accident, in February, 1904, had been in the employ of the defendant company for two or three weeks. He was engaged at the time of the accident with other employés in erecting a large circle pole about sixty-five feet high, and transferring to it a messenger wire serving to support a cable containing many telephone wires; the purpose of the operation being to have the cable run up the new pole to the circle at the

top.   This general undertaking had been inaugurated before
plaintiff entered the employ of the defendant company, and
the messenger wire had been stretched from the east along
a row of poles extending east and west through an alley to
a pole standing about four feet from where the new pole was
planted by plaintiff and others, and having been stretched
by means of pulleys and tackle, had been clamped to the old
pole about thirty-four feet from the ground, and attached to
a " stub " about seventeen feet high and thirty-five feet west
of the old pole where the messenger wire terminated.   The
work had been conducted under the direction and control of
one Leedon, the foreman of the defendant company, in
charge thereof.   In the operation of attaching the messenger
wire to the new pole, which was west of the old pole and
between it and the " stub " to which the messenger wire was
fastened, pulleys and tackle had been used to raise the mes-
senger wire to the proper height on the new pole to correspond
to the place where it was clamped to the old pole.   In
this operation Leedon, who was on the ground while plaintiff
was on the old pole giving information as to whether the
messenger wire was raised high enough on the new pole, was
advised by plaintiff that the messenger wire had not yet been
raised to a proper height; but, this being questioned by Lee-
don, who told plaintiff that he could not " see straight,"
plaintiff had acquiesced, and Leedon had directed the attach-
ment to be made to the new pole, and thereupon plaintiff had
loosened the clamp holding the messenger wire to the old
pole.   On the following day plaintiff, by direction of Lee-
don, went up the old pole to take off two or three cross-
arms which were rendered unnecessary by the fact that
the wires coming from the east and terminating at the old
pole had been superseded by the cable, and in removing the
second cross-arm, which was just under the clamp to which
the messenger wire had been attached, relieved the pressure
of the messenger wire which had rested on this cross-arm,
so that the pole which had been held bent over toward the

west by the messenger wire sprung eastward at the top, giving to plaintiff, who was suspended by his belt and safety strap, a jerk, causing one of the snaps of his safety strap to break, as the result of which he fell backward to the ground and sustained severe injuries.

The negligence of the defendant, as claimed by plaintiff, consisted in the failure of Leedon to advise him that the pole was sprung over to the westward at the top, so that the release of the messenger wire by the removal of the cross-arm would cause it to spring eastward and give the jerk which occasioned his fall. It is evident that, if plaintiff was in as good a situation as Leedon to know what the consequence of taking off the cross-arm might be expected to be, then plaintiff assumed the risk of the operation, and was not entitled to recover; while, if Leedon knew of a danger involved in the operation not apparent to plaintiff, and did not advise the plaintiff of such danger, then the defendant was chargeable with negligence through the omission of Leedon, and there was no assumption of this particular risk on the part of plaintiff. As to this vital question, the testimony of plaintiff was that, while the old pole was bent to the westward, so that it was two feet nearer to the new pole at the top than at the bottom, he had no reason to suppose that this was not due to a natural bend in the pole; that when, on the day before the accident, he released the clamp holding the messenger wire to the old pole, the wire was still resting on the cross-arm, and there was no indication that the messenger wire was still holding it bent to the westward; and that he had no reason to suppose that the release of the cross-arm involved any danger that the pole would spring eastward. It appears from the testimony of Leedon, who was examined as a witness for the plaintiff, that when the messenger wire was first stretched, before plaintiff had entered the employ of defendant, the top of the pole was bent westward to some extent, and it was caused to " buckle " by the downward pressure of the mes-

1. MASTER AND SERVANT: negligence of master: evidence.

senger wire as it was stretched for attachment to the " stub."
But he testified that he had no knowledge that the messenger
wire was resting on the cross-arm, and had reason to sup-
pose that when the clamp was released there was nothing
to prevent the pole resuming its natural position, so that,
when he directed plaintiff to remove the cross-arm, he did
not anticipate that the pole would spring back as the result
of that operation.    The whole controversy was thus nar-
rowed down to the question whether Leedon was negligent
in directing plaintiff to remove the cross-arm without ad-
vising him of any possible danger which might reasonably
have been known to him, but was not known to plaintiff, that
the pole would spring when the cross-arm was removed.    The
essential fact, however, was that the pole had been sprung
to the west and " buckled," to Leedon's knowledge, by the
operation of stretching the messenger wire when it was first
attached to the stub, and there was nothing to indicate
this fact to plaintiff, and we think that as a reasonably pru-
dent man, familiar with such work, Leedon ought to have
known that the pole would spring back when released, and,
as he had not observed or been advised that it had regained
its natural position on the release of the clamp, he should
have inferred that it was still held bent to the westward and
" buckled " by some pressure on the cross-arm, and should
have advised plaintiff of the danger that, when the cross-
arm was removed, the pole might spring, and cause plaintiff
a jar, imperiling his safety.    The testimony for plaintiff
shows that the top of the pole did spring to the eastward about
two feet, so that when it thus regained its normal position the
distance from the new pole at the top was substantially the
same as at the bottom.

Counsel for the appellant argue with much cogency the
incredibility of the testimony tending to show that, after
the clamp was removed which held the messenger wire to the
old pole, the pole should remain " buckled " and bent over
to the westward with the messenger wire simply resting or

binding upon the top of the cross-arm, and contend that Lee-
don had no reason as a prudent man to assume any such situ-
ation.    They claim, also, that it would have been impossible
to pull the top of the pole over to the west to any such dis-
tance by the tightening of the messenger wire when first
stretched, and that it was therefore equally impossible that
the top of the pole could spring back to the eastward any
such distance when the cross-arm was released, and they
insist that this impossibility is demonstrated by the fact that,
when the messenger wire was stretched, the pole had at-
tached to it at least twenty-four wires coming from the east,
which terminated on its cross-arms and were therefore
wrapped around the insulators, which wires would have been
broken by so great a bending of the pole to the westward,
and that, when the cross-arm was taken off, there were at
least six wires extending on to the west (which, by the way,
had been strung after the stretching of the messenger wire,
for all the wires had been broken by a sleet storm interven-
ing between the time the messenger wire was stretched and
the commencement of plaintiff's employment), which must
have been broken by so great a spring of the pole to the
eastward.    It must be said, however, with reference to these
wires extending westward at the time of the accident, that
they did not terminate on the cross-arms of this pole, but
were simply held to the insulators by short pieces of wire
wrapped around them, so that it is not at all impossible that
these wires should slip through the fastenings as the pole
sprung to the eastward.    However this may be, it is evident
that these conditions and circumstances were for the jury
to consider, in determining whether the accident happened
as the evidence for plaintiff tended to show, and we are in
no situation to say that it was impossible that the pole was
so far buckled and bent westward by the stretching of the
messenger wire and held in that situation, after the loosening
of the clamp, by the pressure of the wire upon the cross-arm,
that when released it should spring eastward and cause peril

to plaintiff.   Nor are we prepared to say that Leedon, knowing that the pole had been "buckled" and sprung to the westward by the tightening of the messenger wire, should not have anticipated just what plaintiff testifies to have resulted when the pole was no longer held in tension by the messenger wire.   What it is most difficult to account for is the fact that, after the loosening of the clamp, the pole should have still been held in tension by the pressure of the messenger wire on the cross-arm; but, the general danger involved in the release of the pole from the messenger wire being known to Leedon, we think he should have warned the plaintiff thereof, and should not have assumed that the danger was removed by the loosening of the clamp, in the absence of any information, by observation or otherwise, that the pole had resumed its normal position.   This general danger was unknown to plaintiff, unless he is to be charged with knowledge thereof by reason of the fact that, on the day before the accident, he observed that the guy wires from the old pole to the "stub," which had been stretched before the stringing of the messenger wire, were loose, indicating the possibility that the messenger wire held attached to the stub, and there was nothing to indicate the pole bent further to the westward than it had been when first erected.   But he knew nothing about these previous conditions, and we do not think that the mere slackness of the guy wires would be a sufficient warning to him that the pole was in tension by reason of the messenger wire.

The very difficulty which we have in determining what Leedon and plaintiff, respectively, ought to have assumed and anticipated in view of the knowledge which each had, makes it proper that we should abide by the conclusions of the jury.   These questions were all properly referred to the jurors, and they were in as good a situation to reason about them and estimate the probability or possibility of any particular result and the credibility of the evidence as to what did cause the accident as we are.   Indeed, they

were in a better situation from having heard the testimony of the witnesses. It is elementary that questions of doubt as to the facts are to be determined by the jury, and not by the appellate court.

Having thus indicated the issues of fact which were primarily for the determination of the jury, there is little occasion for amplification as to the rules of law applicable to the case. The substantial complaint for

2. INSTRUCTIONS: refusal.

appellant is that the court erred in not taking the case from the jury on the evidence, and in not giving to the jury certain instructions asked for the appellant, which, if given, would almost necessarily, under the facts, have required a different verdict. No complaint is made of the instructions given, and the court could not have given those which were asked and refused without substantially deciding the case against the plaintiff on the testimony. As the evidence was, in our judgment, such as to sustain the verdict rendered, it was not error to refuse instructions which must necessarily have led to a different result.

There is no substantial conflict between the counsel for the two parties as to the law applicable to the issues of fact. Counsel for appellant cite cases in support of the proposition that the duty of the master to provide a

3. SAFE PLACE TO WORK: liability of master.

safe place has no application where the place becomes unsafe during the progress of the work. This is undoubtedly sound. See *Oleson v. Maple Grove Coal & Mining Co.,* 115 Iowa, 74; *American Bridge Co. v. Seeds,* 144 Fed. 605 (75 C. C. A. 407); *Bedford Belt R. Co. v. Brown,* 142 Ind. 659 (42 N. E. 359); *Holloran v. Union Iron & Foundry Co.,* 133 Mo. 470 (35 S. W. 260). But, in view of the preceding statement as to what the evidence tended to show, it is clear that the unsafety of the place where plaintiff was told to work did not arise by reason of his loosening the clamp and detaching the cross-arm, but by reason of a previous condition known to Leedon and not known to him, which rendered it unsafe for him to

do the thing he was directed to do. He did not cause the dangerous condition, but it already existed. With reference to assumption of risk, it is fundamental that a risk not known to the employé is not assumed, and it is unnecessary to explain the cases on which appellant relies. They are distinguished by a recognition of this elementary principle.

It is true, as contended for appellant, that the ordinary care required of the master does not involve the anticipation of every possible contingency which may happen, but only such as are likely to occur; but, if Leedon knew that the pole had been bent to the westward by the stretching of the messenger wire, he was bound to anticipate that it was likely to spring back when the wire was released, and he might reasonably have anticipated that plaintiff, suspended near the top of the pole by a safety strap, his feet pressed against it and supported only by the usual spurs, would be put in danger by the springing back of the pole to its normal position. Assuming that Leedon knew that the pole was held bent by the messenger wire, the result of its release was not one which he could not have reasonably anticipated. At any rate, the question was for the jury, and we cannot say that a reasonable man would not have anticipated the result.

4. SAFE PLACE TO WORK: warning: care.

On the whole record, we are satisfied that there is no occasion to interfere with the verdict and the judgment based thereon. The evidence that after the accident the top of the pole was nearly four feet away from the new pole, while it was only about two feet distant just before the accident, is too persuasive to justify our indulging in the assumption that it was impossible that the old pole could have been held so far bent over by the tension of the messenger wire on the cross-arm, and could have sprung back so far when that tension was removed, and we are satisfied that the question was one for the determination of the jury.

The judgment is *affirmed.*