ORPHA L. LAMMEY, Administratrix of the Estate of WILLIAM M. LAMMEY, Deceased, Appellant, v. THE CENTER COAL MINING COMPANY, Appellee.

**Mines and mining:** INJURY TO EMPLOYEE: NEGLIGENCE: PROXIMATE
I CAUSE: SAFE PLACE TO WORK. Where a miner, having sole charge of the room in a mine in which he is at work, himself creates

the danger with which he is confronted, the fall of the roof, the employer is not liable for his injury or that of a fellow servant also appreciating the danger, unless it is the duty of the employer upon request to furnish proper and sufficient props which he fails or neglects to do, and such failure is the proximate cause of the injury. The rule that the master must provide a safe place to work has no application where the place becomes unsafe during the progress of the work.

**Same:** STATUTES. Under the statute it is the duty of the employer 2 to furnish sufficient lumber to prop the roof of a mine when needed, and the duty of the miner in charge of the room in which he is mining to make use of it for that purpose.

**Same:** CONTRIBUTORY NEGLIGENCE: PROXIMATE CAUSE: NEGLIGENCE OF 3 FELLOW WORKMEN. Where two or more employees are engaged jointly in the same work, and either or both are negligent in the performance of a duty pertaining to their safety, resulting in the injury or death of one, such negligence is that of a fellow servant for which the employer is not liable: So that where father and son engaged in mining in the same room voluntarily continued the work without protest, knowing that props required to support the roof had not been furnished as requested, and that the roof, though propped to some extent, was unsafe, their negligence was the proximate cause of an injury to the father resulting in his death, for which the employer was not liable.

*Appeal from Polk District Court.*—HON. JAMES A. HOWE, Judge.

TUESDAY, NOVEMBER 23, 1909.

ACTION at law to recover damages for the death of William M. Lammey, deceased, due to a fall of slate in defendant's mine. After a jury was impaneled, and at the conclusion of the testimony, the trial court directed a verdict for defendant, and plaintiff appeals. *Affirmed.*

*Spurrier & Parsons,* for appellant.

*Guernsey, Parker & Miller, Hewitt & Wright,* and *C. Woodbridge,* for appellee.

DEEMER, J.—William M. Lammey, a man sixty-three years of age, and by occupation a carpenter and miner, was on the 26th day of October, 1907, and while in the employ of the defendant, killed by the fall of slate from a roof in one of the rooms of defendant's coal mine, while he and his son, who was his partner, or, in mining parlance, "buddy," were at work in said room. These men had been at work in that room for about one week previous to the accident, and worked it back so that the face of the coal was about thirty-five feet from the entryway. At the mouth of the room the coal vein was about four feet thick; but it increased as the work progressed, so that at the face of the coal it was about four feet and six inches in height. The room was being driven toward the east, and was about twenty feet wide from north to south. To secure the roof props of timber either four by four or four by six inches were used. The props which defendant furnished for the mine were but four feet in length, and to use them successfully a cap about four inches in thickness had to be used, and then a wedge driven in over this cap, so as to make the prop tight enough to stand. At the time of the accident all the props which defendant had sent down to the room had been used, and it is contended that defendant was negligent in that it had failed to deliver, at the mouth of the room where plaintiff's intestate was working, props of the necessary size and length, although ordered on the 24th, the 25th, and 26th days of October, respectively, and before the accident occurred. When plaintiff's son last called for props he was informed by defendant's agent that they had been sent down, and that it was strange they had not been received. Plaintiff's son then went down into the mine, and, as he says, found some unused props in another room in the mine and some others in the "gob;" that he took these and added them to those which had already been set, making some seven or eight under the slate which fell. It also appears that no one but the de-

ceased and his son was working in the room in question; that it was their duty to secure the roof by setting the props, and that they had set twenty or thirty in this room —a line of them on either side of the roadway from the mouth to the face of the coal.   Plaintiff's son had used all the props which he thought were necessary under the slate which finally fell and injured the deceased.   The piece which fell from the roof was approximately five feet wide and ten feet long, and at places from sixteen to eighteen inches thick.   It extended obliquely from a point about five feet from the face of the coal where it was thickest, in a southwesterly direction, the long way of the piece being from east to west, and it extended over the center of the room in which deceased and his son were working.   After the props had been put in the son informed his father of· the fact and told him he had propped it up safe.   The father was working at the face of the coal, drilling, when the roof fell upon him.   The deceased and his son had complete charge of the room, and the defendant company had nothing to do with it, save to deliver the props.   The son really had charge of it; the father simply helping in the loading and drilling.   According to the testimony, the son, after using the props, thought the roof was safe, and so informed his father but a short time before the accident.

As bearing upon the son's knowledge of the defective roof and of the safety of the driveway even after the propping was done, we quote the following from the testimony of the son, delivered upon the trial of the case:

I noticed this slip as I drove through, so at the time my father started work I knew there was a slip, a dangerous piece of slate in the roof above where we were at work.   Worked right under it and dug the coal out from under it.   I discovered it as soon as I reached it and knew it from that time forward until father was killed.   Had discovered the slip shortly after I had started in the room eight or ten days before.   It was about six days before

the accident that it first needed attention, and during that time we drove the face of the mine about fifteen or sixteen feet. . . . Q. Experienced miners know about these slips occurring in the roof of rooms, do they? A. Yes, sir; I should say they did. Q. Was this crack or slip a thing that was visible, that you could see? A. In some places you could, but not all. Q. I mean in this room, this slip that caused the fall? A. Yes, sir. Q. You could see it with the naked eye? A. Yes, sir. Q. And it extended clear across the room? A. Clear across the room. Q. Its presence there, and the fact that you could see it, was within itself a warning of danger? A. It was. . . . Q. You thought it was a dangerous matter to stay under that, did you? A. I did not like to work under it. I do not think it was real dangerous. Q. Why not? A. I did not think it was really dangerous; but I did not think it was safe to work under, standing there loose without sufficient props under it. . . . Q. How long does a piece like that stay up? Any great length of time? A. Not that I know of. Q. Sometimes stay up a week? A. Yes, sir. Q. And sometimes fall inside of thirty minutes? A. Yes, sir. You can't tell anything about when a piece like that is going to fall. Q. Now, it was liable to fall at any time? A. Yes, sir. . . . I had eight props under it all told at that time, and knowing from my experience as a miner that it was liable to drop at any time, I went ahead with my work.

This witness also testified that his father, the deceased, was an experienced miner. He further testified as follows:

He was there drilling at the time. He did not do any of the propping at all. I considered it safe; talked with father about it. Told him I had propped it up safe. I sounded it that morning and made up my mind it was safe the way I had propped it. My experience as a miner taught me that it was liable to fall at any time. I had eight props under it all told at that time, and, knowing from my experience as a miner that it was liable to drop at any time, I went ahead with my work. Was drilling when the piece fell, and father was loading a car under the slip.

I was working at the face. Father was paid for one half of the coal we got out of it, and I for the other half. We determined our hours of work by the tonnage. We determined when to come to work and when to quit. The mine operators had nothing to do with that. We were simply paid for the coal we got out. If we had regarded it as unsafe, so unsafe that we did not want to work there, we could have quit, and there was no one to prevent us.

Regarding the use of props, this witness gave the following testimony:

Had been using four-foot props. The height of the room under this slip was about four feet two or three inches; the thickness of the cap, two inches; of the wedge, about an inch. I do not know that there was anything unusual or out of the ordinary in the method in which we were propping. Q. Is the use of wedges ordinary and common? A. It is. Q. Do you use a wedge about every time you put up a prop? A. You do. Q. And you also use a cap? A. Yes, sir. Q. Well, then there was nothing unusual and out of the ordinary in the method in which you were propping there? A. Nothing that I know of. Q. You used the wedge and the cap and the prop? A. The wedge, cap, and prop. Q. And three of them covered the distance, did they, between the floor and the roof? A. Yes, sir; done to draw the prop up as tight as it should be. Q. What did you drive the wedge with? A. A sledge hammer. Q. Did you drive it good and tight? A. Good and tight; as tight as I could drive it to do any good. In our work there we had to pass under this slip back and forth constantly. On the morning of the 26th I called on Mr. Rowe again for props, and asked him why he did not send them down. He said he had; said he would look the matter up. I got some props myself in room No. 1 after the left north, a work-out room. I found some unused props in the gob and set them under this slip. Q. Did you think you had it safe? A. I did.

Again, he testified as follows:

Q. Could you have gotten any more props under it?
A. I could have got some more under it; yes, sir.   Q.
Where would you have put them?   A. Under both edges
of it.  I had them all wedged and capped.  I set all those
props the day before and the morning of the accident. · I
put up about five the day before.  I got no props the
next morning, only ˙ what I went and found.  None were
delivered to me in my room.  I went out and found some
on the morning of the accident, about ten o'clock.  I did
that to make the place safe.   Q. You ˙ thought it was a
dangerous matter to stay under that, did you?   A. I did
not like to work under it.  I do not think it was real dan-
gerous.   Q. Why not?˙  A. I did not think it was really
dangerous; but I did not think it was safe to work under,
standing there loose without sufficient props under it.

Appellant's counsel argue that under this record de-
fendant was negligent in that it failed to deliver the nec-
essary props at the mouth of the room; that this duty was
a statutory one; that the accident happened
by reason of this neglect or refusal, and
that the deceased did not assume the risk
growing out of the placing of the 'necessary
props for the reason that the duty imposed
upon the defendant was a statutory one which could not
be waived by the deceased.  On the other· hand, these
claims are denied, and it is · argued that no negligence on
the part of the defendant is shown; that plaintiff's intes-
tate assumed the risk and was guilty of contributory neg-
ligence.   As deceased and his son had sole charge of the
room, were creating the dangers with which they were
from time to time confronted, the defendant is not liable
for the injuries which resulted in Lammey's death unless
it appears that by custom or law, written ,or unwritten,
it was bound to furnish sufficient and proper props upon
request; that it failed and neglected to do so; and that
this failure was the proximate cause of the injury.  *Cor-*
*son v. Coal Co.,* 101 Iowa, 224; *Oleson v. Mining Co.,*

1. MINES AND MINING: injury to employee: negligence: proximate cause: safe place to work.

115 Iowa, 74; *Beardsley v. Ironworks Co.,* 129 Iowa, 675; *Cushman v. Carbondale Fuel Co.,* 116 Iowa, 618-621; *McQueeny v. Railway Co.,* 120 Iowa, 522-525; *Long v. Telephone Co.,* 134 Iowa, 336-343.   In *Oleson's* case, *supra,* it is said:

Even if the foreman had directed him to work in this dangerous place without advising him of the danger, and he afterwards became aware of that fact, he was guilty of contributory negligence in not propping the roof or abandoning the work.   *Olson v. McMullen,* 34 Minn. 94 (24 N. W. 318); *Naylor v. Railway Co.,* 53 Wis. 661 (11 N. W. 24); *Perigo v. Rail Co.,* 52 Iowa, 276.   The employee 'is bound to take notice of the ordinary operation of familiar natural laws, and to govern himself accordingly.   Failing to do so, he takes the consequences. He can not charge such consequences upon the master, when he can see that which is open and apparent to a person of ordinary intelligence.'   *Swanson v. Railway Co.,* 68 Minn. 184 (70 N. W. 978).   The doctrine that the master must provide a safe place has no application to a case where the place becomes unsafe during the progress of the work.   As to such danger, the law only requires reasonable care to employ competent men and provide suitable material.

By section 2489 of the Code it is provided that: "The owner or person in charge of a mine . . . shall at all times keep a sufficient supply of timber to be used as props, convenient and ready for use and shall send props down when required and deliver them to the places where needed."   Appellant's counsel also rely upon section 2492 of the Code; but manifestly this has no application to the present case.   By section 2489 the duty to furnish the necessary props is upon the owners, and the duty to use them in rooms, being made by the employees, is upon such employees.   *Taylor v. Coal Co.,* 110 Iowa, 40.

2. SAME: statutes.

If two or more employees are engaged at work in the

same room, and one of them is negligent about work which it is his duty to perform, this is the negligence of a fellow servant for which the master is not liable.

3. SAME: contrib-
utory negli-
gence: proxi-
mate cause:
negligence of
fellow work-
men.

A jury may have found from the record before us that defendant did not furnish the props called for by the decedent's son; but it also appears from the uncontradicted testimony that the son knew of that fact, and that he went into another room, and also into what is called the "gob," and got such props as he thought were necessary, and used them in such a way as that he thought the roof was safe, and so informed his father. He knew that the defendant had not sent down the props called for and undertook to get some for himself. He also testified that the use of a cap and a wedge was necessary, and that there was nothing unusual or out of the ordinary in the method in which he was doing the propping. From the entire record we are constrained to hold that the trouble was not due to defendant's failure to send down props of sufficient length, but to the failure of the son to use the necessary number of props. He undertook to procure these and said that he made the roof as safe as he could. If he did not get and use a sufficient number it was his own fault, and defendant is not to be held responsible for the damage resulting therefrom. In *Wahlquist v. Coal Co.,* 116 Iowa, 720, we said: "The doctrine that an employer must furnish his employee with a safe place for work does not apply to a case where the employee is called on with knowledge to do work inherently hazardous, such as repairing defects. The employee can not recover for injuries received by reason of the very defect which he is employed to repair. . . . The fault here, if any, was in not temporarily propping this dangerous roof until the permanent cross-timbers had been put in place. It is said, however, for defendant, that plaintiff knew that this precaution had not been taken, and therefore assumed the risk. This would, no doubt,

be true if he had had the same knowledge of the condition of the roof which was possessed by Lindblom (the pit boss). The order of a superior will not excuse an employee in assuming an unnecessary danger which is apparent to him. . . . The case is different, also, from that of an accident to a miner while working in excavating coal from a room of which he has charge, and where he works on his own responsibility. In such case the duty to ascertain the condition of the roof and prop it to protect himself against danger rests upon him."

Section 2491 of the Code makes it a crime for anyone to neglect or refuse to prop or support the roof or entries of a mine under his control. The duty of doing the propping was upon the employees in this case, and unless the defendant's failure to supply the necessary props was the proximate cause of the injury, there can be no recovery. Assuming, however, that defendant was negligent in not sending down the necessary props upon request, and that this was the proximate cause of the injury which resulted in the death of Lammey, still we think there should be no recovery for the reason that both father and son knew that the props had not been sent; that the place, although propped as stated, was unsafe, and known to them to be unsafe, and that with this knowledge they both continued to work in this unsafe place, without protest, when they might, at any time, have ceased their employment without fear of displeasing their employer or of discharge from their work. They determined their own hours of work, when they would commence and when they would quit, and the operators had no control over them in this respect. The son testified that he knew the place was unsafe; that there was a "slip" which made it so; that he had this knowledge, which every miner of experience knew, from the time that he first discovered it, which was as soon as they reached it down to the time the father was killed. During that time father and son had driven the face of the mine

something like fifteen or sixteen feet, with full knowledge of the situation. We again quote the testimony from the record bearing upon the proposition now involved: "Now, to some extent I knew that there was an element of danger, and that slate was liable to fall wherever a slit occurred. Had that knowledge in mind all the time I worked in that room. To some extent I knew what the danger was. My father was an experienced miner. They know about these slits. Could see this slit with the naked eye. Its presence there, and the fact that it could be seen, was itself a warning of danger. Q. Its presence there, and the fact that you could see it, was within itself a warning of danger? A. It was." The piece of the roof which fell was immediately over the roadway between the two lines of props. Under such a state of facts we think it clear that the father was guilty of contributory negligence in working under this slate which was, to his knowledge, likely to fall at any moment.

In *Oleson v. Coal Co., supra,* we said:

The employee 'is bound to take notice of the ordinary operation of familiar natural laws, and to govern himself accordingly. Failing to do so, he takes the consequences. He can not charge such consequences upon the master, when he can see that which is open and apparent to a person of ordinary intelligence.' The doctrine that the master must provide a safe place has no application to a case where the place becomes unsafe during the progress of the work. As to such danger the law only requires reasonable care to employ competent men and provide suitable material. . . . There was no evidence therefore of any negligence on the part of defendant and there was uncontradicted evidence of the contributory negligence of plaintiff. Under such circumstances it was proper for the court to direct a verdict for defendant.

In *Mammoth Coal Co. v. Bublis,* 83 Ark. 567 (104 S. W. 210), the court said:

As before stated, the law required mine owners to furnish sufficient props and timbers with which to safeguard the roofs above where they work.  If they fail to do that, and the miner is put to an election whether he will go ahead and risk the danger or quit work, and he concludes to go ahead and work, it becomes a question as to whether in so doing he acted with due care or recklessly exposed himself to an obvious and imminent danger. . . . If the danger is obvious and imminent it is nothing but recklessness for him to expose himself to it, and the law will not permit him to recover damages for an injury directly due to his own lack of ordinary prudence.  *Coal Company v. Estievenard,* 53 Ohio St. 43 (40 N. E. 725).  Now we have set out the main portion of the testimony of the plaintiff bearing on the question of the nature of the danger to which he exposed himself and his knowledge thereof, and we think it shows that he was guilty of want of ordinary care.  It is true that he says that he would not have worked there if he had known that it was dangerous; but he admits that when he tested the rock with the pick, which he says was the best way to test it, the pick test showed that the rock was more or less loose, and that no one could tell how soon or when it would fall.  We said in a recent case that 'if one remains at work under a rock which he knows is liable to fall at any moment, his injury from the fall of the rock is a consequence of his own carelessness, and prevents a recovery on his part.'  *Kansas Coal Co. v. Chandler,* 71 Ark. 518 (77 S. W. 912).  No prudent man should expose himself to such a risk rather than wait until he can secure props with which to secure the roof from falling.  To work under a rock after discovering that it was liable to fall at any moment was knowingly to occupy a position of great and palpable danger when there was no occasion to take such a risk, and the injury of plaintiff was the direct result of this reckless exposure to danger, and we are of the opinion that the court should have directed a verdict for defendant.

*Coal Co. v. Estievenard,* 53 Ohio St. 43 (40 N. E. 725), from the Supreme Court of Ohio, is in facts very much like the one at bar, and in that case it is said:

If the employer has been negligent, either by omission or commission, and the employee knows of such negligence, or ought to have known thereof, he must act with reference thereto, and can not shut his eyes and say that he relied upon the employer performing his duties. As to whether the employee was negligent, his actions should be judged by the facts as they existed within his knowledge, or within what he ought to have known, at the time he acted or failed to act; and the previous negligence of the employer, which was known to the employee, or ought to have been known by him, will not excuse him. In the case at bar, the failure to furnish props at the working place of the plaintiff below was negligence on part of defendant below; but if plaintiff knew of his negligence, or ought to have known thereof, and remained in the room, knowing the roof to be dangerous, his injury was directly caused by his own negligence in remaining in a room known to be dangerous, and not by defendant's negligence in failing to furnish props. Again, if plaintiff below obtained sufficient props from another room, and therewith propped his room until he regarded it safe, and then entered the room and was injured, such injury was not caused by the failure of defendant below to furnish props, but by the error in judgment of plaintiff below in believing he had set up sufficient props to make the roof safe. Defendant below should not be charged with this error in the judgment of plaintiff below. Even though defendant below failed to furnish props, and was therein negligent, yet if plaintiff below knew that the room was dangerous, or ought to have known it, and with this knowledge walked into the room, his injury was caused by his own recklessness, and not by the failure to furnish props. This was not a case in which the employer was to furnish a safe place for the workman, but a case in which the workman made his own place in which to work, and the duty of the employer ended with furnishing props to the working place of the miner. The miner is charged by statute with keeping his working place safe for himself and all others.

In view of our holding, it is not necessary to discuss the question of assumption of risk. At times it is difficult

to divorce this from contributory negligence; but that there is a distinction is well pointed out by the authorities. See *Narramore v. Cleveland*, 96 Fed. 298 (37 C. C. A. 499, 48 L. R. A. 68), opinion by Taft, J. Failure of the son to get mine props, or to use those which were at his command, should be imputed to the father, and not to the defendant. It was, as the Supreme Court of Ohio said, an error of judgment for which defendant is not responsible, and this negligence is to be imputed to the father. We need not discuss the question as to whether or not the doctrine of assumption of risk applies where there has been a breach of statutory duty. That question does not, as we view it, arise upon the record now before us.

Our examination of the case leads to the conclusion that the trial court was right in directing the verdict, and its judgment must be, and it is, *affirmed.*