MATTHEW HOLMES, Administrator, Appellant, v. BLOOMFIELD
COAL & MINING COMPANY, Appellee.

MASTER AND SERVANT: Place for Work, Etc.—Servant Having
1  Control Over and Creating Conditions—Evidence—Mines and
Minerals.  It is the duty of a miner, upon entering his working
place, to examine it, and, if it is not safe, to refrain from
work until it is made safe.  (Section 2489-16a, Code Supple-
ment, 1913.)  Evidence reviewed, and held to show that a
servant, in preparing an entryway in a mine, had control over
and was creating the conditions which resulted in his in-
jury, and that the record established no actionable negligence
against the master.

MASTER AND SERVANT:  Warning and Instructing Servant—
2  When Unnecessary.  Full knowledge by the servant of the dan-
gers attending his work and how to avoid such dangers obvi-
ates any necessity for warning and instruction.  So held as to
a miner engaged in reconstructing an entryway in a mine, and
injured by falling slate.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY,
Judge.

MAY 22, 1917.

REHEARING DENIED DECEMBER 18, 1917.

ACTION to recover damages for the death of plaintiff's
intestate, caused by a fall of slate in defendant's mine.
Trial to a jury, and at the close of plaintiff's testimony,
there was a directed verdict for the defendant.  Plaintiff
appeals.—*Affirmed.*

*John T. Clarkson,* for appellant.

*Stipp, Perry, Bannister & Starzinger,* for appellee.

1. MASTER AND
SERVANT:
place for work,
etc.: servant
having con-
trol over and
creating con-
ditions: evi-
dence: mines
and minerals.

PRESTON, J.—Plaintiff's intestate was
injured June 20, 1914.  He, with two oth-
ers, Peterson and Rudkins, was engaged in
shooting down the roof, in the construction
of an underground haulageway.  These two
were the only witnesses for plaintiff as to

the transaction in question, and were the only persons present besides the deceased. This haulageway or entry was being driven from the second vein of coal down to the third. The grade of the slope being too great for haulage, it became necessary to reduce the grade. To do this, it was necessary to take down from 6 to 14 feet of the roof of the lower portion, and fill up at the bottom. This would reduce the grade so that it would be practicable for haulage. It was at this work of taking down the roof, and sloping, filling up and leveling off the bottom, that plaintiff and others were engaged at the time of the accident. There was timber material along the entry or haulageway which was taken there before the shooting commenced, so that they could start timbering behind when they got through shooting, and there were two timbermen working about 100 feet distant from deceased the night he was injured. There were dirt men working at the east end of the slope. The mine foreman was not present, and appellee contends that there was no one acting in such a position, and that none was needed, as the men were all experienced, and capable of performing the duties and taking care of the safety of their places as the work progressed. Peterson and Rudkins were operating a drill on a scaffold, and deceased was leveling off the material after it had been shot down, preparatory to laying the track. A piece of slate fell from the roof, striking deceased upon the head, from the effect of which he died. This piece of slate was about 3 to 4 inches thick, and about 18 inches square. It fell from the roof and broke off at the rib. It feathered out towards the middle of the entry. Two companies of men were working at each end of this haulageway. Peterson and Rudkins began at the west end and were going east. They had advanced about 200 feet. Deceased, in the fore part of the shift, had been working on the east end. At the time deceased was hurt, these two companies were about 100 feet apart. Deceased was only

8 or 10 feet from Peterson and Rudkins at the time of the accident. Deceased was 32 years of age, a capable and experienced coal miner. He began working in the mines when 13 years of age, and had worked in different mines and dug coal in different places. He had never timbered at any of the places he worked, except in his own working place. He had not been a company man at any of the places he had worked, except in defendant's mine. He had never done any trapping. His father testifies that he taught deceased how to mine; taught him to take care of himself and watch the roof. When defendant company began sinking its new shaft, deceased entered its employment, working by the day, and had been so engaged about 4 months.

The negligence alleged is that: (1) Defendant failed, omitted and neglected to timber the roof at the place where the injury occurred; (2) to take down or remove the loosened portions of the roof which fell and caused the injury; (3) to give deceased proper warning of the condition of the roof at the place where the injury occurred; (4) to properly plan and arrange the work of making the roadway or entry, in that there were insufficient workmen or timbermen furnished to keep the place properly timbered, or to remove the loosened parts of the roof; (5) defendant was negligent in permitting the work of shooting down the roof to be prosecuted far in advance, to wit, 75 feet beyond where the timbering was done, following the work of shooting down roof.

Defendant's motion for a directed verdict was upon the grounds, in substance, as follows: Because the uncontradicted evidence shows: (1) No actionable negligence was shown; (2) deceased was working in a new place which was being made and constructed, and defendant did not owe the duty of keeping the same safe, but it was plaintiff's duty to care for his own roof; (3) the workmen en-

gaged in making the new entry were each looking out for himself; (4) deceased was an experienced miner, and fully acquainted with the hazards of the business, and was warned to watch the roof at and above the place he was working; (5) the accident was one of the incidents of the employment; (6) the evidence is not sufficient to sustain a verdict against defendant; (7) if there was any negligence, it was that of a fellow servant in failing to properly test the roof; (8) deceased was guilty of contributory negligence in failing to properly sound the roof.

Appellant's contentions are substantially these: That there was a jury question, because the evidence shows that the place where deceased sustained the injury was one over which defendant company had control, and the conditions were within the knowledge of the defendant, or should have been; that deceased acted under the directions of the mine foreman; that, at the time of the injury to deceased, it was no part of his duty to make repairs of the roof by way of timbering the roof of the haulageway, which was in process of reconstruction, or to take down or remove the loosened portions thereof, and the defendant owed him the duty to exercise reasonable care to provide him with a safe place to work; that defendant was engaged in reconstructing the roadway to make a convenient means of ingress and egress for workmen, and to make the roadway more convenient as a haulageway, and defendant was obliged to exercise reasonable care to furnish deceased a reasonably safe place to work, where he had no duty to perform in the timbering or making of the place. In support of these propositions they cite Code Supp., 1913, Section 4999-a3; *Hartshorn v. Mardis Company,* 165 Iowa 454, 460; *Wilder v. Great Western Cereal Co.,* 134 Iowa 451, 460; *Winslow v. Commercial Building Co.,* 147 Iowa 238; *Jacobson v. United States Gypsum Co.,* 144 Iowa 1; *Funk v. Leonard Construction Co.,* 159 Iowa 320; *Verlin v. United States Gypsum Co.,*

154 Iowa 723. And they cite *Wahlquist v. Maple Grove, C.
& M. Co.,* 116 Iowa 720, to the point that, where the laborer
had no duty to timber the place in process of repair, even
though the laborer is repairing a defect, if injured, he may
recover. They cite also *Correll v. Williams & Hunting Co.,*
173 Iowa 571, to the point, as they state it, that defendant,
having undertaken to change the roadway and construct
a new one, and to direct the working forces and classify
the work which each particular class of workmen should per-
form, could not delegate the discharge of the duties to its
servants. Other cases are cited to the point that deceased
did not assume the risk, and that the others were not fellow
servants.

In the view we take of the case, the evidence did not
show actionable negligence on the part of the defendant.
This is decisive of the case, and renders it unnecessary to
discuss the other points. We think counsel for appellant
misapprehends the record as to the duties of deceased and
the company, under the circumstances shown here, and
that, therefore, the cases cited and relied upon are not en-
tirely applicable.

It may be well at this point to set out the evidence
somewhat more in detail, as bearing upon the point just
suggested. This we shall attempt to do in a general way,
without going too much into detail. The two witnesses
Peterson and Rudkins were examined at length, with nu-
merous re-examinations and recross-examinations; and two
amendments to abstracts, setting out additional evidence,
have been filed, one by each of the parties. One Carlson
was the pit foreman in charge of the work, and, as witness
puts it, was the man who looked after the direction of the
work that had to be done. We do not find that any partic-
ular directions were given deceased as to his duties at the
time in question, except that one of the men, or perhaps both,
warned him, and suggested that he examine the roof and

take care of himself, and the like. The two amendments to abstracts have reference to this matter, and set out more fully the testimony of witness Peterson. When asked as to whom deceased looked to for direction, witness said:

"Well, we got orders, Mr. Rudkins in the evening, what was to be done there at night on that work, and he would get directions from us through Carlson, from Carlson through us."

When asked if he gave directions to deceased, he said, "Not exactly," and explained as follows:

"Holmes was working on the east end in the fore part of the shift. After we ate supper, we needed another man for leveling off behind us, and Arsenica kind of had a little charge at night over the east end, as well as we had of the west end, and he came over, and we, either Rudkins or I, asked him if he had any man on the east end he was not using; so I think it was me said, 'You had better send one over here after supper; we have got more than we can handle, and we will have to level off some here,' and if they was not working there he could send one over, and that he should fetch a churn drill from the bottom. So after supper he went to the bottom and got one of his drills and came over. That was deceased. But we did not send for him to come over. We said we wanted a man. After deceased came over, we told him to level off the work behind the platform, where it was not quite level enough."

The testimony shows, also, that both Peterson and Rudkins had been doing part of the leveling off as they went along, and that, when deceased was hurt, it was the second shot they were shooting in the top layer that night. And the witness says that he (witness) did not direct deceased to do any part of the timbering, and when asked as to whether it was any part of the duty of deceased to do timbering, he answered that it was not, to his knowledge, and says that the mine foreman did not give him direc-

tions to give to the timbermen. We shall refer in a moment to the testimony that it would not have been proper to attempt to timber the small piece of slate that fell, and that the witnesses both testified that it was the duty of deceased and all three of them working together to look out for their own safety, and that they warned deceased to sound the roof, and that he did so, and that it was the duty of deceased to take down the pieces of slate. The evidence shows that deceased and Rudkins and Peterson were all doing company work, paid by the day. As said, the testimony shows that it would not be proper to timber a piece of slate of the size of that in question, although it could be done if the workmen considered the roof dangerous. The evidence also shows that ordinarily they only timber within about 20 feet of where they were, but that there are times when they timber closer than 20 feet. But the evidence is that, when they do timber up close to the working face in driving an entry, it is the duty of the man driving the entry to set the props, and that it is his duty to set props which are closer than 15 feet. Both Peterson and Rudkins testify that it was not practicable nor proper to prop up a piece of loose slate the size of that in question, and that it should have been taken down. The testimony shows that in shooting down the roof they were using sufficient powder to shoot down the top and break it up into small pieces, and that this left the roof in a shattered condition at the point they were shooting, which extended back beyond where deceased was working, and that, if they regarded it as dangerous, they would pull it down. As we understand it, the haulageways and the entries, when completed, were all timbered. But, if timbering had been proper at the place in question, it appears that an adequate supply of timbers was in the entry, subject to the use of the men. The evidence shows that deceased sat down on some of the timbers after he was hurt. The timbermen

were working only a short distance west of deceased, and in the same entry; and the witnesses both testify that they and the deceased had the right to call upon the timbermen to help them if they so desired. The witnesses both testify at length that it was the duty of deceased to trim the sides and take down any loose slate from the roof. Rudkins testifies that he warned deceased in regard to the roof, and Peterson says that he told deceased that, as he went along, he should sound the roof, and that deceased did tap several pieces, and that he refreshed deceased's memory about sounding the roof, and told him that every once in a while it was necessary to sound it; that he heard the roof working and dropping, and told deceased that, when the slate was working behind the platform, he should sound it. He says, also, that sounding the roof is something which a person can learn in a short time in a mine. He says he saw deceased sound the roof, but does not know whether or not he sounded the piece that fell. The evidence also shows that all three of the men were sounding the roof at intervals just before the accident. Both witnesses also testified that it was the custom that each of the men working there should test the roof for himself and care for his own safety.

We shall not take the time or space to set out the evidence more in detail. It appears from the record that the entry or haulageway was not ready for travel and usage, but was in process of being constructed, and that deceased and the two men with him were creating the conditions as they existed at the time of the injury; that the fall of slate occurred within 10 or 12 feet of the place where Peterson and Rudkins were blasting; that ordinarily, in entry work, the roof is not timbered by the company closer than from 15 to 20 feet of the working face, and that, if it is closer than that, it is the duty of the men driving the entry to set the

props which are closer than 15 feet; that it was the duty of deceased, in addition to leveling the slate after it fell, to take down pieces that were dangerous; that it was his duty· to sound the roof and take care of himself, and that he did sound the roof; that it was not practicable to prop a piece of slate of this size, but that if it had been, there was an adequate supply of timbers available. It should have been stated that it is shown that the roof was inspected when they commenced, or shortly before they commenced operations on the night in question.

Appellee contends that it was the duty of deceased and of those working with him to care for the safety of their, working places, and that, defendant having furnished, accessible and ready for use, an adequate supply of timbers and timbermen, its duty was performed, under Chapter 106, Sections 33, 41 and 44, of the Acts of the Thirty-fourth General Assembly; and they cite *Williams v. Craig-Dawson Coal Co.,* 165 Iowa 588, *Lammey v. Central Coal Mining Co.,* 144 Iowa 640, *Williams v. Norwood-White Coal Co.,* 146 Iowa 489. But it is contended by appellant that Section 44 of the act just referred to, which reads in part as follows: "It shall be the duty of each employe to examine his working place upon entering the same and shall not commence to mine or load coal or other mineral until it is made safe. Each miner or other employe employed in a mine shall securely prop and timber the roof of his working place therein and shall obey any order or orders given by the superintendent or mine foreman relating to the width of the working place and to the security of the mine in the part thereof where he is at work"—has no application to the case at bar, because it has reference to the working place where the miner is engaged at mining coal, and they cite *Carnego v. Crescent Coal Co.,* 163 Iowa 194, at 199, where it was said:

"Of course, it was their duty to securely prop or sup-

port the roof or entries under their control [meaning the miners]. Section 2491, Code. But was the entry at the point of the accident under their control? As said, the evidence on this point was in conflict. Section 44 of Chapter 106 of the Thirty-fourth General Assembly declares that: 'It shall be the duty of each employee to examine his working place upon entering the same and he shall not commence to mine or load coal or other mineral until it is made safe. Each miner or other employee employed in a mine shall securely prop and timber the roof of his working place therein.' This has reference to the place where the employee is 'to mine or load coal or other mineral,' and not to the entry through which he reaches such place or brings his tools or the car to use or load. Whether the roof of the entry shall be inspected and repaired by the employer or the miner depends upon who is in control, and, if the jury found that, according to custom and usage, the defendant's employees, Smith and Pevlik, were required to repair the entry where the switch was, and were then in charge of that work, it necessarily follows that the defendant, if these men failed to exercise ordinary care therein, and the injury resulted from such failure, was negligent."

But in that case there was a conflict in the testimony as to who was in control of the place. We think in the instant case there is no conflict on that point, and in the Carnego case, where the court said that the statute had reference to the place where the employe is to mine or load coal or other mineral, and not to the entry through which he reaches such place or brings his tools, etc., the court had reference to a completed entry, or an entry so far completed as to have passed beyond the control of the miner, and so that it would not be his working place in the sense used in the statute. The same rule would apply to a haulageway such as was being constructed here, which was to be used as an entry when completed.

Of this, counsel for appellant says that, in the instant case, the evidence shows that the mine foreman was in charge of the work, either in person or by representatives, and that the mere fact that they were making a new place would not place the same under the control of deceased, because deceased had nothing to do with shaping up the roof, in the way of taking down the shattered portions or in the way of timbering. But, as said before, we think counsel misapprehends the record at this point.

2. MASTER AND SERVANT: warning and instructing servant: when unnecessary. The second specification of negligence is covered by what has already been said, and the third specification, as to the failure to warn, is not sustained by the evidence. Deceased was a miner of long experience, and doubtless knew all that defendant could have told him. Aside from this, the testimony shows that deceased was warned and instructed by Peterson and Rudkins. If deceased was as fully aware of the dangers and how to avoid them as he could have been had he been warned and instructed by the defendant, there would be no negligence in failing to instruct as to that which deceased already knew. *Douglas v. Scandia Coal Co.*, 161 Iowa 180, 184, and cases.

The fourth specification of negligence, in regard to defendant's keeping the roof timbered or taking down the slate, has been covered by what has been said, and the fifth and last specification, in regard to defendant's permitting the shooting down of the roof to be prosecuted too far in advance, is not sustained by the evidence before set out. As before stated, deceased knew that shots had been fired at this place only a short time before, and that the effect thereof was to loosen the roof. It was his duty to sound the roof over the place where he was working. He was warned in regard to this, and it was his duty to take down the piece of slate. Under the evidence, the defendant did not timber closer than within 15 or 20 feet of the working face, and

the piece which fell was within about 10 feet of the place where the drill was being operated.

We shall not take the time or space to review the cases cited. It is true, as said by appellant, that some of those cited and relied upon by appellee are where the conditions are not precisely as here.

It is our conclusion from the whole record that appellant did not show actionable negligence on the part of the defendant, and the trial court, therefore, properly directed a verdict for the defendant.

The judgment is—*Affirmed.*

GAYNOR, C. J., WEAVER, EVANS, SALINGER and STEVENS, JJ., concur.