D. E. REED, Appellee, v. REX FUEL COMPANY, Appellant.

Physician and patient: PRIVILEGE: WAIVER: EVIDENCE. Where a
1    patient testified to complaints made by him to his physician concerning the alleged pain and suffering resulting from his injuries, he thereby waived any question of privilege, and the physician then became a competent witness to the same matters. Exclusion of the evidence of the physician in this case was prejudicial error.

Master and servant: NEGLIGENCE: ISSUES: ASSUMPTION OF RISK:
2    INSTRUCTIONS. Where plaintiff alleged negligence in the construction of the building in which the engine was situated, by which he was injured, in that there was insufficient room between the engine and the wall of the room for a man to pass in safety: and that the floor was so defective that he was likely to stumble and fall thereon, and also that defendant failed to properly guard the machine, defendant could not complain of an instruction that the doctrine of assumption of risk was not applicable to the first ground of negligence alleged, and that it did not apply to the second under the express provisions of the Code relative to guarding machinery.

Same: CONTRIBUTORY NEGLIGENCE: SUBMISSION OF ISSUE. Where
3    plaintiff's injury resulted from the alleged negligent location of an unguarded machine, and the defective condition of the floor of the building, by reason of which he was thrown against the machinery and injured, and there was evidence of notice to defendant of such defects and promise of repair, the question of plaintiff's contributory negligence was for the jury.

**Same:** CONTRIBUTORY NEGLIGENCE: INSTRUCTIONS. Where the evidence was such as to authorize submission of the question of plaintiff's contributory negligence, a requested instruction that if plaintiff, with full knowledge of the unguarded condition of the machinery and of the defective condition of the floor on which he was at work, realized the danger in using the floor, but at the time of the injury had forgotten the location of the defect in the floor, and stepping thereon was thrown against the machinery, and his act in so stepping on the defect in the floor was the direct cause of his being thrown against the machinery, then plaintiff's forgetfulness of the location of the defect in the floor did not excuse him from exercising ordinary care, and if such forgetfulness was the cause of stepping upon such defect in the floor, and such act was the direct cause of his being thrown against the machinery, he would be guilty of contributory negligence, did not foreclose consideration of that question by the jury, but rather contained an implied assumption that the same was for its consideration.

**Same:** PROXIMATE CAUSE: INSTRUCTIONS. An instruction that negligence is the proximate cause of an injury which follows the negligent act, if it can be fairly said that in the absence of the alleged negligence the injury would not have happened, properly defines proximate cause.

**Same:** INSTRUCTIONS: CONSTRUCTION: BURDEN OF PROOF. Where the precise questions of negligence submitted to the jury and the question of assumption of risk have been clearly pointed out and fairly covered by other paragraphs of the charge, they need not be again included in an instruction as to the burden of proof: for where the instructions as a whole cover the entire case clearly and present all the issues raised by the pleadings and evidence, an objection that certain of the instructions standing alone and unmodified by others are erroneous, will not be sustained.

*Appeal from Mahaska District Court.*—HON. JOHN F. TALBOTT, Judge.

SATURDAY, JUNE 7, 1913.

ACTION to recover damages for injuries received by plaintiff, who was a servant of the defendant company, engaged in operating a gasoline engine, for the purpose of pumping water from a coal mine. It is alleged that the defendant was negligent in failing to guard certain cogs, gears,

belts, shafting, and set screws, used on or about the engine, as by law provided, and was also negligent in not furnishing plaintiff a safe place to work, due to the fact that it failed to furnish the necessary belt shifters, or loose pulleys, and so placed the engine in the building, where it was operated, that it did not give sufficient room between the walls of the building and the side of the engine, where a clutch was located, for a man to pass with safety; that the place was negligently maintained, and was dangerous; and that defendant was warned of the danger before the accident occurred, and was requested to repair the same, which it promised, but failed to do before the accident occurred. He also alleged that the floor of the building was rough and uneven, and so left that while plaintiff was operating the machine he was liable to stumble and trip thereon, and that, while in the act of manipulating the clutch, so as to put the machinery in gear, he did slip and fall into the unguarded gearing of the machinery, and received the injuries of which he complains. Defendant denied the allegations of the petition, and pleaded assumption of risk and contributory negligence on the part of the plaintiff. On these issues, the case was tried to a jury, resulting in a verdict and judgment for plaintiff in the sum of $7,000, and defendant appeals. *Reversed*.

*Burrell & Devitt* and *Chandler Woodbridge*, for appellant.

*McCoy & McCoy* and *Dan Davis*, for appellee.

DEEMER, J.—Plaintiff was twenty-two years of age at the time he received his injuries, and had been working for the defendant about seven months. He was employed to operate a gasoline engine, which was used to pump water out of an abandoned shaft. Part of the machinery was over this abandoned shaft, and all of it was in a building known as the "engine house," and there was a narrow aisle between a belt

on the machine and one of the walls of the building, and along and through this space plaintiff passed in operating the clutch, upon the machine, which put the pump in motion. The following is a description of the situation, as observed by some of the witnesses:

I took the measurement of the passageway on one side between the belt and the side of the building. It was twenty-two inches wide by the square. The passageway led back from the engine up to the pump, the gearing, and platform of the pump, and the clutch was on the east side of the building. The passageway was between the belt and the side of the building. To go into the pump room you pass from the engine room onto a platform raised about ten inches. That was made of native timber, with boards lying lengthwise. The boards were two by four and two by ten. That constituted the floor up to the clutch. It was over the old shaft. The belting, gearing, and where the cogwheels meshed were not guarded in any way. It could have been guarded by piping or by lumber. They could have put a sheet iron shell over the gears. Such a protection would not interfere with the operation of the machinery at all. In the alley where he walks there was a board broken, and another one was warped up edgeways. There was a wedge strip broken off so that, when you stepped on it, it would come down and then raise back when the man was off. It was hardly noticeable until you stepped on it. It would come down two or two and a half inches under the weight of a man.

Another witness testified as follows:

The belt wheel at the engine is twenty inches in diameter, and the other belt wheel is forty inches. The engine was rated at two hundred and fifty revolutions a minute. It ran at the rate of seventeen feet a second. There could have been a railing made in front of the belting in such a way as to keep a person off. You could make it out of two by four's or could make it out of piping; either would have been all right. It should be five feet high anyway. The protection that I have spoken of would not interfere in any way with the working of the machinery.

And plaintiff, himself, said of it:

The belt, cogwheels, and machinery were not guarded or protected in any way. The belt might have been guarded by putting piping at one side of it to keep a man from falling onto it, or a railing, or just a plank. The cogwheels could have been guarded by taking a piece of metal of some kind and made it come over the top of the cogwheels and shafting with a flange down the side so that nothing would be able to pass inside into the gearing. Such a guard would not interfere in the proper use of the machinery.

And still another said:

The runway was full of old boards, of course, and pieces of studding laid across there, of what I would call dimensions of two by four or two by six, or something of that kind, and about two inches thick. The platform would be about two and a half feet wide. I noticed where the wheel fell that there was one board broken. It was broken nearly in two so that when you stepped on the splintered end it would spring down. *Mr. Reed called the master mechanic's attention to it. He looked at his watch and said, 'It is just quitting time now,' and that he would not have time to fix it today, but would just as soon as he could get to it.*

Plaintiff gave the following testimony as to how the accident occurred:

On the day I was hurt I had just come from dinner at the house, about a block from the shaft. Just as the engine got to going I went back to the clutch. The belt came up about three feet four, or three feet eight. I am six feet tall. The broken place in the floor was just where I had to stoop to go under the sill. It was about four feet away from the clutch. After I got the engine started I did as I always did. I walked back to the clutch very carefully. I could not walk straight; I had to walk sideways, and very carefully walked back to the clutch. I shoved the clutch in and turned around, just kind of half turned, standing partly straight, and then walked towards the engine. I walked back to the clutch and threw

the clutch in and turned around kind of sideways and started back. I had to be careful in stooping down under this board, and the belt caught me and pulled me right up over the belt wheel, and jammed me over against the gearing. It threw me about three and a half or four feet, and just when I was lying with my back against it my second finger caught. That pulled me over the north side, just where the pump works in the pump room. I was then lying on my left side like, with my head this way. When I started away I found my fingers were off. I fell on this hip against the sill. My fingers were caught in the cogs; my clothing was ripped and torn. I started to work in January, and this injury occurred on the 17th. day of May. The conditions were exactly the same, except that the board wasn't split. There had been no change in the location of the machinery and the pulleys, and I had been in charge of it every day, including Sundays. I knew that the cogwheel was not guarded and the belt was not guarded. I knew the distance in the runway, but I never measured it. The runway was in exactly the same condition; nothing had been changed. I knew it was close, but didn't know the exact distance. The belt revolved at the rate of 1,700 feet a minute, somewhere near that.

Q. You understood, and of course appreciated fully, the danger of coming in contact with that belt? A. Yes, sir; I knew that if I got caught I would get hurt. I understood that. Q. You knew that the first day you went there? A. Yes, sir; I knew I had to be careful; yes, sir. Q. You knew a belt revolving on a belt wheel running 1,740 feet a minute, that that meant you must keep away from it? A. Yes, sir; of course. Q. Of course, the more you saw of it, the more that fact was impressed on your mind? A. Yes, sir. Q. When you called the master mechanic's attention to the dangerous character of the floor, he agreed to fix it promptly? A. Yes, sir. Q. You knew when you complained of the floor, where the board was that had been broken? A. I knew where it had been broken; yes, sir. Q. You did not look for it again? A. It was there, I could step over it as a rule, and then stoop and go under the sill, and it would turn me next to the framework. Q. How far was it from the wheel, the belt wheel? A. Well, as I said, it was a very little bit to the south. Q. When you set your weight of your foot on that broken board it went down? A. Yes, sir. Q. And the board next to it was warped up? A. Yes, sir. Q. Do you mean that when you stepped on

it with your foot it went down two or three inches lower than the board next to it? A. Well, when your foot happened to be a little over on the other side, it would slack over. Q. Well, now, what I am trying to get at, whether you observed how far it would go down; what the difference was between the broken board when it was clear down and the board that was warped up? A. I never measured it when it was down, but I expect it would go down a couple of inches. Q. How much was the other board warped up? A. Well, I could not tell correctly from the shape by looking at it. It probably stuck up an inch, anyway, or an inch and a half. Q. One would go down and the other up an inch or an inch and a half? A. Yes, sir. Q. Now, the reason you wanted it fixed was on account of the danger of a man tripping and falling into the belt when he would step on this broken place in the board? A. Yes, sir. Q. You notified Mr. Conville that it was dangerous; that there was danger that you might fall on the belt, and you wanted it fixed? A. Yes, sir. Q. You went to work and passed over it on Friday and Saturday and the rest of the week? A. Yes, sir. Q. Saturday you worked and went back and forth, as you have described; on Sunday you went over it, made four trips over it; on Monday you started out knowing where the location of it was; and when it was not fixed you went to Mr. Spencer? A. Yes, sir. Q. You called his attention to the fact that it was very dangerous where the board was broken; that there was danger that a man might trip and fall on the belt when walking along that runway? A. Yes, sir. Q. Now, during all this time you had gone back and forward and had never stepped on the broken board? A. Yes, sir. Q. Because you knew where it was and did not step on it? A. No, sir. Q. Of course, you knew it was there, and that if you stepped onto it, it might throw you onto the belt? A. Yes, sir. Q. For that reason you avoided it? A. Yes, sir. Q. When you came back on Wednesday, the day the injury occurred, I believe you stated that you knew that the broken board difficulty had not been fixed? A. Yes, sir. Q. You came from home and immediately walked back and forth, after starting your engine, etc? This, I believe, you say was about noon? A. Just after noon. Q. 12:30? A. About 12:20. Q. You came up there and started the engine? A. Yes, sir. Q. The belt was going? After you started up the engine, the machinery was going? A. Yes, sir. Q. You stepped back, and you forgot about the broken board and you stepped onto that,

and it threw you onto the belt? A. Yes, sir. Q. Now, that is the way in which the injury of which you complain occurred? A. Yes, sir. Q. Now, the belt was running. Which part of the belt hit you? A. The top part. Q. You knew that it was a dangerous place that you were working in? A. I knew that it was dangerous and that I must be careful to come out right. Q. You would not have been injured at all if you had not temporarily forgotten about the broken board and stepped on it and was thrown onto the belt in that way? A. Not at all. I didn't exactly step on the broken board, but stepped on the other board that was curled up there. I fell over onto the belt. The belt was going north, and the belt carried me north. I was dragged by the belt and thrown over onto the gearing. The false platform was on the top of the shaft; that was some distance below the ground. The cogwheels were built over this platform in the shaft. This false platform was eight feet below where the cogs meshed. It might have been further, probably ten feet. When the machinery was stopped there was no danger from the cogwheel and when the machinery was going I was not expected to go around where the cogwheels were when it was in motion. The only occasion you had for being near the cog-wheel was when they needed oiling, and that was always done when the machinery was stopped. That was the only way I could oil it.

He also testified as follows:

I walked back to the clutch very carefully. I could not walk straight; I had to walk sideways, and very carefully walked back to the clutch. I never thought that I would slip in any way. *I didn't know the board would let me down the way it did.* Q. You may state whether or not you were giving attention to what you were doing at that time? A. I always did. Q. You stepped back, and you forgot about the broken board, and you stepped onto that, and it threw you onto the belt? A. Yes, sir. Q. You would not have been injured at all if you had not forgotten about the broken board and stepped on it and was thrown onto the belt in that way? A. *Not at all. I didn't exactly step on the broken board, but stepped on the other board that was curled up there.* Q. Now, you may explain to the

jury, if you will, how you caught your foot in the hole in the broken board. *A. This board was warped up here, as I said awhile ago, and as I was walking along and stepped on this warped board my foot slipped off this warped board a little and threw me over onto the broken board, and that is the way it occurred.* Q. And that threw you into the belt? A. Yes, sir.

The extent of plaintiff's injuries is a matter of dispute. On the one hand, it is contended that he suffered severe and permanent injuries to his back and spine, while, on the other, it is insisted that his injuries to his back and spine are simulated or are neurotic in character, and that there is no trouble either with his back or spine. The nature and extent of his injuries became, therefore, a very material inquiry. One of the doctors who attended the plaintiff was a physician by the name of McClure. Plaintiff had testified upon his examination in chief regarding complaints made to this doctor of injury to his back, hip, and leg, and introduced the testimony of other witnesses who said they also heard plantiff make these complaints to Dr. McClure at the time he was treating him. When the defendant came to introduce witnesses on its own behalf, it called Dr. McClure, and the following record was made:

Q. Now I will ask you, Dr. McClure, if at any time while you were treating Mr. Reed as a patient, if at any time he made any complaint to you about his back or thigh, or about them being injured in any way? (Objected to as incompetent, irrelevant, and immaterial, and as calling for privileged communication between doctor and patient, and the witness is incompetent. Sustained, and the defendant excepts. The defendant offers to show by this witness that during all the time that he was treating the said D. E. Reed he at no time, either at his home or at any other time or place, made any statement or complaint that he was suffering pain in his back or hip, and that the only injury he complained of while being treated by this physician was the injury to his hand.) Q. I suppose you charged him, Doctor, for that work? A.

Yes, sir. Q. $25? A. $25; yes, sir. (Plaintiff makes the same objection, that it is incompetent, irrelevant, immaterial, and calling for privileged communication between doctor and client, and the same is prohibited by statute, and the witness is incompetent. Objection sustained, offer denied, and the defendant excepts.)

I. This ruling was erroneous. Plaintiff had already unsealed the lips of the doctor, by testifying affirmatively to complaints, which would indicate injury to the back, vertebrae, or spine, and thus opened the door to testimony from the physician regarding such complaints. The rule for this state on this subject is: "Manifestly, if the patient himself breaks the seal of secrecy and gives publicity to the whole matter, there is a waiver; and this is true whether the publicity is given by the testimony of the physician, by the testimony of the patient himself, or by the testimony of his other witnesses. In other words, when the patient voluntarily publishes an occurrence of the sickroom, he cannot be permitted to insist that the prohibition and privilege of the statute continues to exist as to his physician. If, by his voluntary act, he lifts the veil, the professional duty of secrecy ceases, and the physician is a competent witness under the statute. It would be a reproach to the administration of justice, even in the absence of a statute, if the patient himself might detail all that occurred with his physician, and yet compel the physician to remain silent." *Woods v. Town of Lisbon,* 150 Iowa, 433; see, also, *State v. Bennett,* 137 Iowa, 427; *Lauer v. Banning,* 140 Iowa, 319; *Burgess v. Sims Drug Co.,* 114 Iowa, 275; *Denning v. Butcher,* 91 Iowa, 425; *Kelly v. Cummens,* 143 Iowa, 148.

1. PHYSICIAN AND PATIENT: privilege: waiver: evidence.

Counsel for appellee claim that the ruling was nonprejudicial in character, but with this we cannot agree. In view of the claims made by the respective parties, the testimony was very material to the defendant, and its exclusion left the matter of complaints, said to have been made to his physician,

without any denial. The effect thereof upon a jury is easily imagined.

II. The case was submitted to the jury upon two separate specifications of negligence, as follows:

First. That the building was so constructed that it did not give sufficient room between the walls of the building and where the clutch was located for a man to pass with safety; that the floor on which plaintiff stood was rough and uneven, and so left that, while plaintiff was operating said engine and machinery, he was likely to stumble and trip thereon. Second. That defendant failed to properly guard the machinery around which plaintiff was working, namely, the drive belt, gearing, and cogs in question, as provided by the laws of this state.

As to the first ground of negligence, above stated, the trial court held as a matter of law that plaintiff might assume the risk of working about the place; but, as to the second, there could be no assumption of risk under the factory act of this state, as amended. The first specification of negligence is bottomed upon an alleged common-law duty, and the second upon a statutory enactment, which expressly provides that an employee does not assume the risk in working about unguarded machinery. In this there was no error of which defendant may complain. Acts 33d General Assembly, chapter 219; *Murray v. Coal Co.*, 159 Iowa 1. Whether or not plaintiff might have complained had the verdict been against him, we need not, at this time, decide.

2. MASTER AND SERVANT: negligence: issues: assumption of risk: instructions.

The trial court also instructed that, as to each specification of negligence, plaintiff must show freedom, on his part, of contributory negligence. Again, defendant has no cause for complaint, unless it be, as his counsel claim, that the testimony shows contributory negligence as a matter of law. With reference to this point, we are constrained to hold that the matter was for the jury. The case is not ruled by

3. SAME: contributory negligence: submission of issues.

*Miller v. Monument Co.*, 141 Iowa, 701. On the contrary, it is governed by *Miller v. Sash & Door Co.*, 153 Iowa, 735; *Stodola v. Railway Co.*, 152 Iowa, 37; *Jeffrey v. Railroad Co.*, 56 Iowa, 546; and other like cases. In view of the claimed notice of the defect and the promise to repair, the case, on the question of contributory negligence, was essentially for a jury. *Poli v. Coal Co.*, 149 Iowa, 104. See also, *Kirchoff v. Hohnsbehn Co.*, 148 Iowa, 508; *Stephenson v. Tile Co.*, 151 Iowa, 371; *Verlin v. Gypsum Co.*, 154 Iowa, 723.

In this connection, the trial court, at defendant's request, gave the following instruction:

(17½). You are instructed that if you find from evidence that the plaintiff, with full knowledge of the unguarded condition of the belt and cogwheels of the machinery with which he was working, and of the warped and broken and uneven condition of the floor, and that he realized the danger of injury to himself by stepping on said broken and uneven floor, and you further find from the evidence that plaintiff, at the time of the injury, had forgotten the location of the broken board in the floor, and that he stepped on said broken board and was thrown against the belt and injured, and you further find from the evidence that plaintiff stepping on the broken board was the direct cause of his being thrown on the belt, then, and in that event, you are instructed that plaintiff's forgetfulness of the location of the defect in the floor, with which he is shown to have been familiar, and the danger from which he fully realized, did not excuse him from exercising ordinary care, and if you so find—that is, that plaintiff's forgetfulness was the cause of his so stepping upon said broken board, and that the stepping upon said broken board was the direct cause of his being thrown upon the belt—then the plaintiff would be guilty of negligence contributing to his injury and your verdict should be for the defendant.

It is argued that the verdict is not responsive to this instruction, and that under the testimony adduced there should

have been a verdict for the defendant. We are not ready to
agree with counsel on this proposition. In-

4. Same: contributory negligence: instructions.

deed, in asking the instruction, there was an
implied assumption that the question of contributory negligence was for the jury. *Gordon v. Railroad
Co.*, 154 Iowa, 449, and cases cited. Aside from this, however, we think the question of contributory negligence, was
not foreclosed by this instruction. See cases hitherto cited.

III. In defining proximate cause, the trial court said:
"(7) You are instructed that negligence is the proximate
cause of an injury which follows such negli-

5. Same: proximate cause: instruction.

gent act, if it can be fairly said that, in the
absence of the alleged negligence, the injury
and damage complained of would not have occurred."

This instruction, while short, has support in *Parmenter
v. City*, 113 Iowa, 301; *Tibbitts v. Railway Co.*, 138 Iowa,
184.

IV. The second instruction reads as follows:

You are instructed that the burden of proof is upon the
plaintiff to establish from the evidence, and by a preponderance thereof, the material allegations of his petition; that
is: (1) That he was in the defendant's employ at the time he
was hurt. (2) That the defendant was guilty of negligence in
one or the other of the grounds of negligence, alleged in the
petition, which are submitted to you by the court. (3) That
the plaintiff's injuries, if any, were the proximate result of
the defendant's alleged negligence. (4) That plaintiff did
not by his own negligence, at the time he was hurt, contribute
to his injury. (5) That the plaintiff has suffered damage.
If these matters are all established by a preponderance of the
evidence, your verdict should be for the plaintiff, for such
sum as the evidence may show him entitled to, under the instruction hereinafter given for the measure of damages. If
said several matters are not all so established, then your verdict should be for the defendant.

This should be read in connection with No. 4, hitherto
quoted, and, when so read, there was no error and no con-

flict.  The exact negligence which the court submitted to the
jury was plainly pointed out in the fourth
instruction.  Again, it was not necessary to re-
fer to the defense of assumption of risk in
this instruction, as that was fairly, if not too
generously, covered in succeeding paragraphs of the charge.
*Wilder v. Cereal Co.*, 130 Iowa, 263; *Harney v. Railroad Co.*,
139 Iowa, 359, and cases cited.

6. SAME: instruc-
tions: con-
struction:
burden of
proof.

V.  Counsel pick out a number of separate paragraphs
of the charge and say that, standing alone, they were erron-
eous, because they did not cover the entire case and omitted
essential elements to plaintiff's recovery.  The trial court,
out of caution, gave this instruction:

(25)  The instructions are given in different ways to
meet the different phases of the testimony and claims of the
parties.  The court has not attempted to embody all the law
applicable to the case in any one of these instructions; and
in considering any one instruction you should consider it and
construe it in the light of, and in harmony with, all other
instructions given, and apply them as a whole to the evidence
in the case.  It is your duty as jurors to follow the instruction
of the court.  In your jury room you should not refer to, dis-
cuss, or consider anything in connection with the case, except
the evidence received upon the trial and these instructions.
All extraneous matters, statements, and suggestions should
be carefully discarded by you.

We think the instructions covered the case in a reasonably
clear manner and presented every issue raised by the plead-
ings and the testimony, and that defendant has no just ground
for complaint.  *Walrod v. County*, 110 Iowa, 349; *Timmins
v. Railway Co.*, 72 Iowa, 94; *Meyer v. Button Co.*, 112 Iowa,
51; *Engvall v. Railway Co.*, 145 Iowa, 560; *Zimmerman v.
Brannon*, 103 Iowa, 144; *Smothers v. Hanks*, 34 Iowa, 286.

VI.  The negligence of the defendant is established be-
yond all conflict, and the case turned largely on the question

of plaintiff's contributory negligence, and the amount of damages to be awarded in the event the verdict was in his favor.

Appellee has presented a number of motions to strike evidence, arguments, etc., and to dismiss the appeal. None of those seem to be meritorious, and they are, each and all, overruled.

For the errors heretofore pointed out, the judgment must be, and it is, *Reversed*.