JOHN CARNEGO, JR., Administrator of Estate of Frank
Carnego, deceased, v. CRESCENT COAL COMPANY, Appellant.

Mines and mining:   INJURY TO EMPLOYEE:   NEGLIGENCE:   EVIDENCE.
1   In this action for injury to a mine employee, the question of whether
it was the duty of employees to inspect and repair the roof of an
entry where plaintiff's intestate was killed by a fall of slate, or
whether such was the duty of the operator of the mine, was for the
jury.

Same:   SAFE PLACE TO WORK:   STATUTES.   The statutes requiring coal
2   miners to examine and prop the roof of their working places and
of entries under their control, do not require them to inspect and re-
pair the roof of an entry not under their control.

Same: SAFE PLACE TO WORK: DUTY TO REPAIR. Whether the roof of a mine entry is to be inspected and repaired by the employer or the miner depends upon which is in control of the place; and if it is found that according to custom and usage this duty devolved upon certain employees who were in charge of the work at the time of an accident, and they failed to exercise ordinary care therein from which injury resulted to another miner, it was negligence chargeable to the employer.

Same: PROMISE OF REPAIR. Under the evidence in the instant case the questions of whether plaintiff's intestate, who was killed by the fall of slate, had been promised that the roof would be repaired and whether he relied thereon, were for the jury.

Same: SUBMISSION OF ISSUES: WAIVER. By insisting upon the submission of an issue a party waives the right to thereafter object that the evidence was insufficient for its consideration.

Same: SAFE PLACE TO WORK. Until otherwise informed a workman may assume that the place assigned to him is reasonably safe.

Same: CONTRIBUTORY NEGLIGENCE: EVIDENCE. A servant having knowledge of a danger which the employer has promised to repair is not bound to quit work immediately, unless the danger is so obvious that ordinary prudence would forbid a continuance. Under the evidence the question of the contributory negligence of plaintiff's intestate in continuing to work with knowledge of the dangerous condition was for the jury.

Same: EVIDENCE. On the question of whether it was the duty of plaintiff's intestate or that of other employees to repair the entry to the mine, the agreement between operators and miners of that district, making it the duty of miners to prop the roofs of their rooms, but making no reference to the entries, was admissible as tending to sustain defendant's claim that it was the duty of miners to repair entries.

Same: NEGLIGENCE: INSTRUCTIONS. Allegations of negligence having no support in the evidence ought not to be referred to in the instructions; but where the several grounds of negligence alleged in the petition were stated, but the jury was told they were not to be considered as separate grounds, and the evidence relating thereto was only to be considered in determining whether plaintiff's intestate had been furnished a safe place to work, no prejudice resulted.

Same.   The instruction in this case that plaintiff could not recover if the preponderance of the evidence showed that his intestate was negligent in· the work of removing one of the pillars of the mine was not prejudicial to defendant, though he would not be required to establish negligence by a preponderance of the evidence, but only by sufficient evidence to meet that of plaintiff.

*Appeal from Mahaska District Court.*—HON. K. E. WILCOCK-SON, Judge.

FRIDAY, OCTOBER 24, 1913.

ACTION for damages resulted in a judgment against defendant, from which it appeals.  *Affirmed.*

*Burrell & Devitt,* and *John T. Clarkson,* for appellant.

*McCoy & McCoy* and *S. V. Reynolds,* for appellee.

LADD, J.—The deceased was a miner eighteen years of age. He was killed on May 12, 1911, by the fall of slate estimated to have been eight or nine feet wide by nine to fifteen feet long, ten or twelve inches thick, from the roof of the seventh west entry of the defendant's coal mine No. 6, at the point where the cars were switched to room No. 10.  He and his father had been mining in this room three months, but, during the two weeks previous, his brother, Mike Carnego, Jr., and George Katko had been working with them; the four dividing earnings when received.  This entry off the back south entry had been driven about fifty-eight feet and then turned in a northerly direction into room No. 10.  The room after being driven had been widened to about twenty feet, and the persons mentioned were engaged in robbing the pillar between it and room No. 9. According to their testimony, they had worked at this about a week and had "just cracked through the pillar." The pillar between this room and room No. 11 had not been removed, and according to the testimony of Michael Carnego, Jr., none of

the other pillars in that part of the mine had been disturbed. Several witnesses testified in behalf of plaintiff that it was the custom and usage of the company to inspect the roof of the entries and to timber and repair the same, and that this duty was being performed by two of its employees, Smith and Pevlik, at and for some time prior to the accident. On the other hand, the superintendent of the mine testified that:

After we ceased prosecuting the entries forward and the rooms, then these miners would start to pull the pillars back. . . . The pillars had been taken out back within twenty-four feet of the fall of slate. I measured it. Forty feet of the pillars had been taken out on one side and twenty-five feet on the other side. . . . Room No. 10 had been excavated and room No. 11 was excavated and pillars were standing between 10 and 11. The coal was all taken out of 8 and 9 clear through that entry more than three hundred feet. They were driven in about ninety feet.

He also testified that he had been in the room four days before the accident; that everything looked "all right then"; and that, upon entering it after the accident, he noticed that:

She was squeezing, squeezing the small pillars that were left right down into the bottom, and 'busting' them and carrying right down the entry. The entries were going to a raise of 15 degrees, and the weight coming on would naturally push it down the hill, and it would crush and smash one pillar, and as soon as it would smash that pillar it would ride over onto the other and smash it down. It was extending over when I examined it within an hour or two after the boy was injured. The coal had the appearance of being crushed or crumbled. I could hear the coal cracking. That was on account of the weight going onto the coal. We sometimes call it a squeeze or break. . . . This condition is caused by taking out the coal, taking out all the supports from under it. . . . It fell tight on Tuesday or Wednesday; . . . completely caved in. . . . It fell in ninety feet down the entry toward the shaft. . . . These men were engaged in pulling the two entry pillars here, one on each side of the entry,

the one between room No. 9 and this one here; that would be on each side of the seventh west entry where it had turned in a northerly direction. They were working on the outside corner of the outside entry stump, and the entry stump is opposite the place where it is claimed that Frank Carnego lost his life. It was the custom and usage of coal miners in May, 1911, in mine No. 6, before that time, that the miner when he went in the mine to sound the places from out where he stood to change his clothes and started in to go to work. He would sound that place right up into the working place. The miner's working place was not confined exclusively to the place just where he digs and loads coal in accordance with the custom and usage of mining.

Two other witnesses testified that, according to custom and usage, the miners took care of all of the roof from the place or switch where they get cars to the face of the coal where they are at work when robbing the pillars.

As said, the men associated with deceased testified that they were working at the pillar between rooms 9 and 10, had been removing no other, and that there was no ''squeezing'' or breaking of the roof generally prior to the fall of slate at the switch. Whether shooting off the powder at the face of the pillar where the miners were loading coal would affect the roof at the switch was in dispute, but there was no controversy as to the duty of the miners to take the cars at that place. The deceased had heard the approach of Roberts, the driver, with cars and at the instance of his brother left the face of the pillar for the switch and as he reached that point was crushed by the falling slate.

I. The main controversy was and is whether the inspection and repair of the roof of the entry where the slate fell devolved upon the miners or upon the company. The evidence bearing upon this issue was in conflict, and no amount of minimizing of the testimony introduced on either side by counsel can obviate this conclusion. Several witnesses testified that it was the custom and usage of the mine

1. MINES AND MINING: injury to employee: negligence: evidence.

for the company to inspect and repair the roof of the entry. The testimony was directed to the portion of the entry in controversy, for the witnesses swore the miners had nothing to do with the entry, and appellant is mistaken in saying that it fell short of disclosing what part of the roof of the entry it was required to inspect. On the other hand, the superintendent testified in substance that it was the duty of the miner to inspect the roof from where he changed his clothes to the face of the coal where he worked. He was corroborated by other witnesses who said this duty of inspection devolved upon the miner from the switch to the face of the coal where he was employed, especially when pillars were being removed. Plainly enough the issue was for the jury.

II. Nor is there anything in the statute which arbitrarily casts the burden of inspection and repair of the entry on the miners. Of course it was their duty to securely prop or support the roof or entries under their control.

2. SAME: safe place to work: statutes.

Section 2491, Code. But was the entry at the point of the accident under their control? As said, the evidence on this point was in conflict. Section 44 of chapter 106 of the Thirty-fourth General Assembly declares that: "It shall be the duty of each employee to examine his working place upon entering the same and he shall not commence to mine or load coal or other mineral until it is made safe. Each miner or other employee employed in a mine shall securely prop and timber the roof of his working place therein."

This has reference to the place where the employee is "to mine or load coal or other mineral" and not to the entry through which he reaches such place or brings his tools or the car to use or load. Whether the roof

3. SAME: safe place to work: duty to repair.

of the entry shall be inspected and repaired by the employer or the miner depends upon who is in control, and, if the jury found that according to custom and usage the defendant's employees, Smith and Pevlik, were required to repair the entry where the switch

was and were then in charge of that work, it necessarily follows that the defendant, if these men failed to exercise ordinary care therein, and the injury resulted from such failure, was negligent. *Thayer v. Smoky Hollow Coal Co.*, 121 Iowa 121; *Taylor v. Star Coal Co.*, 110 Iowa 40; *Cotton v. Coal Mining Co.*, 147 Iowa 427.

III.   Michael Carnego, Jr., testified that, about two weeks before the accident, James Smith sounded the roof at the switch in his presence and that it sounded loose and heavy

4. SAME: promise of repair.

and that he then said "he would have it fixed right away, immediately." The witness swore that he "thought that they would fix it." Smith gave a different version of the affair, saying that both he and Carnego were considering the whole thing as not in good condition but stated that the conversation occurred but five days prior to the accident. The jury might have found a promise of repair, and we think the evidence was sufficient to carry the issue as to whether Carnego relied thereon to the jury. Though he did not employ the word "rely" or "relied," he did say that he thought Smith would fix it, and this circumstance, in connection with his continuing to work, indicated his reliance on the promise. Conceding without deciding that the knowledge of Michael Carnego, Jr., was to be imputed to the deceased, in all fairness, the latter would also be entitled to continue in the service of the defendant for such reasonable time as might be accorded for reparation. *Poli v. Numa Block Coal Co.*, 149 Iowa 104; *Cotton v. Coal Mining Co.*, 147 Iowa 427. The jury might have found that the conversation occurred but five days previous, as testified by Smith, and have concluded in view of the condition of the roof at that place, as testified to by plaintiff's witnesses, that the delay was not unreasonable. *Huggard v. Refining Co.*, 132 Iowa 724.

IV.   There was no evidence tending to show that the decedent knew of the condition of the roof at the entry. As-

suming, however, that the knowledge of Mike Carnego, Jr., should be imputed to him, appellant contends that he was guilty of such negligence in going beneath the defective roof as should defeat his recovery. But, in the fifth and sixth instruction requested, defendant asked that this issue be submitted to the jury. It seems to be well established that, by requesting the submission of an issue, a party waives the right thereafter to insist that the evidence was insufficient for its consideration. *Spicer v. Webster City*, 118 Iowa 561; *Reed v. Rex Fuel Co.*, 160 Iowa, 510; *Gordon v. Railway*, 154 Iowa 449.

5. SAME: submission of issues: waiver.

But, aside from this, we do not think that the evidence was conclusive. The employees had a right to assume, until informed to the contrary, that the place was reasonably safe in which to do the work required. *Kroeger v. Marsh Bridge Co.*, 138 Iowa 376.

6. SAME: safe place to work.

The knowledge of the defective condition of the roof was accompanied by a promise to repair, and, under the law, the employee was not bound to quit work immediately, unless in the exercise of ordinary prudence a continuance seemed hazardous to him acting as an ordinary prudent person, and it was for the jury to say under all circumstances, in view of the condition of the entry, the duties of the employees, and their opportunities for observation, whether the plaintiff was negligent in continuing to take the risk of obtaining the car at the switch as long as he did. *Poli v. Coal Co.*, 149 Iowa 104; *Reed v. Rex Fuel Co.*, 160 Iowa 510; *Cotton v. Coal Mining Co.*, 147 Iowa 427.

7. SAME: contributory negligence: evidence.

V. Resolution No. 4, an agreement between the operators and miners of district No. 13 in which defendant's mine was located and to which it was a party, was received in evidence over defendant's objection. It read: "In accordance with the state law the company shall furnish all necessary timbers and the miner shall keep his room securely propped. If a miner, working in a room,

8. SAME: evidence.

fails to securely prop the same or neglects to as directed by the pit foreman or carelessly shoots down the props or timbers and a fall of slate occurs through such failure, negligence or carelessness, he shall immediately clear his roadway of such falls of slate and do all necessary retimbering, and in case of his neglect to do so the company may do such work and charge the expense thereof to said miner.'' This was admissible as bearing on what was required of the miners and, in omitting reference to any duty of theirs with respect to the entries, tended to confirm the evidence that it was not the custom for them to care for the entries.

VI. The petition alleged negligence (1) in the manner of inspection of the roof of the entry, (2) in not employing competent inspectors, and (3) in failing to properly inspect the roof. The court stated these in designating the issues, and the third instruction said the burden of proof was on plaintiff to establish ''negligence in one or the other of the grounds of negligence alleged in the petition,'' but in the fifth paragraph of the charge told the jury that, ''in construing the plaintiff's petition and amendments thereto, the court holds that the charge that the plaintiff makes against the defendant is that the defendant was negligent in failing to provide the deceased with a reasonably safe place to work, and the question of inspection and failing to care for the entry and employment of incompetent inspectors, if any, are not separate grounds of negligence.'' This in effect withdrew the separate allegations from the consideration of the jury as constituting separate grounds of negligence; and, even though there may not have been evidence to support one or two of them, mentioning them under the circumstances could not have worked prejudice. The instruction explained that the effect of the specific allegations was to assert that defendant had not provided a reasonably safe place at which to obtain cars for loading, and that these were to be construed only as bearing on that issue. Even though there were no evidence in support of one or more

9. SAME: negligence: instructions.

of them, this did not necessarily obviate the conclusion that the place may have been unsafe because of some dereliction on the part of defendant amounting to negligence. To submit an issue upon which there is no evidence has been denounced as error; but the court did not do this but advised the jury that these were not issues save as evidence relating thereto might bear on whether plaintiff was provided with a safe place to work.

In the fifteenth instruction the jury were told that ''before the plaintiff can recover it is necessary that he show by a preponderance of the evidence that the defendant was guilty of negligence in the respect substantially alleged.'' The allegations had been construed by the court and their significance defined, and negligence in that respect had reference thereto. If the jury considered the instructions as a whole, there was no escape from passing on the issues whether the defendant was in control of the entry and required to make it reasonably safe for the use of the miners, whether it so did, and whether decedent was in the exercise of reasonable care. Though the practice of stating the allegations of a petition and then construing them or of enumerating grounds of negligence in support of which there is no evidence is not to be approved, we think there was no prejudice. It is enough ordinarily to state the issues to be submitted for determination, and the jury has no concern with those which for any reason are withheld therefrom.

VII. In the twenty-first instruction the court told the jury that:

The defendant claims that the deceased, Frank Carnego, was guilty of negligence in this: That he and his fellow miners (that is, his father and brother and George Katko) removed or was removing pillars in the mine, 10. SAME. and that, by reason of the lowering of the roof caused thereby, the roof in the entry where the accident occurred became broken and a part of the same fell, causing the death of the said Frank Carnego. And upon this you are

instructed that if you find by a preponderance of the evidence that the deceased, together with his father, brother and George Katko, removed the pillars, or a part thereof, in the vicinity in which they were then working, and that by reason of said removal, if any, the roof in the entry broke and fell, causing the death of the said Carnego, and you so find, then the plaintiff cannot recover.

The defendant interposed no such claim but insisted that deceased and his associates were rightly engaged in removing pillars. The defendant did claim that the work they were doing (i. e., removing pillars) caused the roof to weigh down heavily at and about the place they were working, and that they were negligent in view of the work being done in not giving the roof in question attention. Even if defendant did so claim, the burden was not on it to establish their negligence by the greater weight of evidence but merely to meet that adduced by plaintiff by showing this to have·been as probable as the cause alleged by him. But it is not perceived wherein the instruction could have been prejudicial. It was negative in character, telling the jury that, if the work of removing the pillars caused the falling of the slate, there could be no recovery. Though a contention not urged by defendant was stated, the instruction as a whole was favorable to defendant and did not constitute reversible error.

Other instructions are criticised, but the charge as a whole fairly stated the law applicable to the issues. The instructions refused, in so far as correct, were included in those given. The amount awarded was not excessive.

The judgment is *Affirmed.*

WEAVER, C. J., EVANS and PRESTON, JJ., concur.