BYRON V. SEEVERS, Appellee, v. THE CLEVELAND COAL COMPANY, Appellant.

**BROKERS:** Authority—Usual and Customary Methods.  An agent who has authority from his principal to sell property may adopt the usual and customary methods whereby that sale may be accomplished; for instance, when situated at great distance from the property, he may employ other brokers to find purchasers.

**BROKERS:** Compensation—Ownership of Lands—Evidence.  Evidence reviewed, and held sufficient to show that the lands sold· by the broker belonged to the defendant.

**EVIDENCE:** Relevancy, Materiality and Competency—Facts Not in Issue—Interwoven Transactions.  Facts which, though not in issue, are so interwoven with a fact in issue as to be a part of the same transaction, and qualify or explain it, are relevant and generally admissible.  So held in an action on a contract for commissions for the sale of lands, it being held that *other* and *different* contracts for commissions with other companies, allied with defendant in the same general plan and scheme, were admissible.

**EVIDENCE:** Admissions—General Managers and Presidents.  Admissions of the president and general manager of a corporation, with respect to matters of business of the corporation, are admissible when material and relevant.

**BROKERS:** Effecting Sale—Evidence.  Letters passing between those who represented the *purchaser* are admissible as part of the *res gestae*, on the question (a) whether the broker procured the purchaser in question, and (b) whether the purchaser knew of the broker's agency and treated with him as such.

**WITNESSES:** Impeachment—Contradictory Statements.  A witness may always be impeached by showing that he has made statements out of court inconsistent with those made in court.  So held where the contradictory statements were contained in the witness's correspondence.

BROKERS:  Compensation—Evidence—Reasonable Value of Services
—When Inadmissible.  Evidence of the reasonable value of services is inadmissible in an action wherein plaintiff bases his right to recover for services, solely on the existence of an express contract for a specified and agreed price, and defendant bases his entire defense on the ground *that no contract of any kind was made with plaintiff.*

APPEAL AND ERROR:  Reservation of Grounds of Review—Motion for New Trial—Specification of Error.  That a verdict is contrary to instructions, is not raised by a motion for new trial which makes the points that the verdict (a) is contrary to the evidence, (b) is the result of passion and prejudice, and (c) is contrary to law.

APPEAL AND ERROR:  Right of Review—Estoppel—Requesting Instructions.  Requesting instructions on certain questions works an estoppel to thereafter assert that there is no evidence justifying the submission of such questions to the jury.

TRIAL:  Instructions—Partial Covering of Case.  An instruction is not erroneous because not fully covering the case, other instructions supplying the deficiency.

TRIAL:  Instructions—Applicability to Evidence.  An instruction not applicable to, and really at war with, the evidence, is properly refused.

PRINCIPAL AND AGENT:  Authority of Agent—Acts and Declarations to Prove.  Manifestly, an instruction is erroneous which directs the jury that "the *acts* and declarations of an agent, alone and of themselves, are incompetent to prove his authority," etc.  The *acts* of an agent, with the knowledge of his principal, may be very competent as bearing on his authority.

*Appeal from Wapello District Court.*—D. M. ANDERSON, Judge.

TUESDAY, SEPTEMBER 26, 1916.

REHEARING DENIED, MONDAY, JANUARY 22, 1917.

ACTION at law to recover a broker's commission for finding a purchaser for certain coal lands belonging to defendant.  The case is bottomed on an express agreement on the part of the defendant to pay plaintiff 5 per cent commission on the selling price of the lands.  The defendant

filed a general denial, and also an affirmative defense, to be hereinafter noted. Upon trial to a jury, a verdict was rendered for plaintiff in the sum of $22,245.82, upon which judgment was rendered, and defendant appeals.—*Affirmed on condition.*

McNett & McNett and J. C. Mitchell, for appellant.

S. V. Reynolds, John N. McCoy and Jaques & Jaques, for appellee.

DEEMER, J.—I. This is the third appearance of the case in this court. Opinions on the former appeals will be found in 158 Iowa 574, and 166 Iowa 284. The first of these opinions contains a lengthy statement of the issues as they stood before the last trial, and also a recitation of some of the facts as they then appeared of record. After remand, the plaintiff filed a substituted petition, in which his claim for commission was bottomed upon an express contract to pay him 5 per cent of the selling price for finding a purchaser, or purchasers, for what is called the Marion County, or "Belinda-Dallas," fields of coal. This was denied by defendant. The defendant filed a counterclaim against plaintiff for $700 rent collected by him, and, except the sum of $13.71, wrongfully appropriated by him; also a counterclaim for $236.56, which it claimed it was entitled to upon money which plaintiff misappropriated and retained for a period of about nine months. Plaintiff admitted the claim for rent, but denied the claim for interest.

It thus appears that the issues are now comparatively simple; but, as on the other appeal, the testimony is conflicting and very much involved, largely because of the number of dealings between plaintiff and the various owners of coal lands in Mahaska, Marion, Polk, and perhaps other counties. The corporations involved are the Whitebreast Company of Illinois, The St. Paul Coal Company, The Cleveland Coal Company, The Cardiff Coal Company,

and the Crestline Syndicate. The Whitebreast and the Cardiff Companies were Illinois corporations, and the Syndicate was a group of individuals who owned a coal field in Polk County. The other companies named were Iowa corporations. G. W. Tracr, an officer of some of these corporations or companies, J. C. Osgood, also an officer of some of them, and J. M. Blee, who was also an officer of some, are also involved in the controversy.

One of the first questions in the case is whether or not plaintiff was ever employed by the defendant Cleveland Coal Company for any purpose. This is affirmed on one side, and denied on the other. We shall refer to this matter again during the course of the opinion, merely remarking, at this time, that defendant strenuously insists that there was not sufficient testimony to justify a verdict against it for any amount, not only for the reason that it never employed plaintiff at all, but for various other reasons, to which we shall subsequently give our attention. In addition to this, it is contended that the verdict is contrary to the instructions as given; that the trial court erred in giving certain of its instructions, erred in rulings on the admission and rejection of testimony, and erred in not setting aside the verdict returned, because excessive and not sustained by any testimony.

II. It may be well at the outset to dispose of defendant's claim that there is not sufficient testimony to justify the verdict or any verdict against it. The same proposition was involved in the first appeal, and we there held that there was sufficient evidence, if believed by the jury, to justify a verdict for the plaintiff. We have carefully gone over the record on this appeal in the light of the testimony on the first trial, and find that, while there is some difference in the evidence on the two appeals, it is not of sufficient importance to justify another conclusion. There can be no doubt of the sufficiency of the testimony to show that G. W.

Traer, the president and general manager of the defendant, employed the plaintiff to find a purchaser for the coal lands in the Belinda-Dallas fields, and the only questions here are: (1) Did Traer have authority to make such a contract, and (2) did the coal lands belong to the defendant, or were they owned by Osgood individually?

1. BROKERS: authority: usual and customary methods.

Doubtless, Traer, simply because of his presidency of the defendant company, would have no right to enter into such a contract, but he was not only president of the company but also its general manager, and it was by and through his directions that the lands were acquired. Moreover, the defendant, if it was the owner of the lands, had the advantage of the contract, and sold the lands to the purchasers found by plaintiff. Again, there is direct testimony that plaintiff had direct authority from Osgood, who, with himself, owned practically all of the stock in the defendant company, to sell the land; and we are of opinion that this authority was sufficient to justify Traer in using the ordinary means for finding a purchaser, to wit, to employ someone to do so. Traer lived in Chicago, and the principal office of the defendant company, as well as of most of the others we have named, was in Chicago. Traer was not near the coal fields, and, in carrying out his authority, he would of necessity be compelled to employ someone near them to look after finding a purchaser for them. No authority is necessary for these propositions, but we cite in support thereof, *Fritz v. Chicago Grain & Elevator Co.*, 136 Iowa 699; *Lull v. Anamosa Nat. Bank*, 110 Iowa 537; *Ney v. Eastern Iowa Tel. Co.*, 162 Iowa 525.

2. BROKERS: compensation: ownership of lands: evidence.

The only serious question in this connection is whether or not defendant in fact owned the coal lands at any time prior to October, 1904, the time when its records show it acquired the lands from Osgood.

Osgood testified that he furnished the money to buy the lands from his own personal account, and was reimbursed therefor by the company in October of the year 1904. The record, however, shows without question that Traer took the contracts for the coal lands in his own name, and that he undertook to deal therewith as if they belonged to defendant. It also appears that all the business of the Cleveland Company was cleared through the Whitebreast Company, which was owned by the same stockholders as the Cleveland Company. All transactions with reference to the lands in controversy were entered upon the books of the Whitebreast Company as having been on behalf of the Cleveland Company, and the books of the Whitebreast Company show many charges against the Cleveland Company for options and for prospecting the Belinda-Dallas field. Moreover, there is sufficient testimony to show that, from and after an early month in the year 1903, plaintiff was employed by the Cleveland Company, and his regular salary was paid by that company. A jury was justified in finding that plaintiff was employed by the defendant company through Traer, not only on a regular salary, but was also to have a commission for finding a purchaser for the lands. Again, there is testimony in the record showing, or tending to show, that the Cleveland Company was not only anxious to get extensions of the options on this land, but also was anxious to sell it. Osgood seems to have been a man of means, and if he were the purchaser or optionee, he would have had no difficulty in obtaining the funds. Again, there is testimony to the effect that the Cleveland Company tried to borrow money for the financing of its deals. According to some of the books in evidence, the Cleveland Company furnished the money to buy the lands. Moreover, there can be no doubt under the testimony that the lands were purchased for the Cleveland Company; and, if Osgood furnished the money, he had nothing more than a lien upon

the lands for the money advanced.   Another potent fact in the case is that Traer conveyed the lands, or the most of them standing in his name, to the purchaser, the Consolidated Company, directly, pursuant to a purported sale made by the defendant company.

On this record, there was sufficient testimony to show that the lands in fact belonged to the defendant, although the title thereto may have been in Traer in trust at the time the agreement was made with plaintiff to find a purchaser therefor.   The entry made by defendant in its books is not conclusive on this question.   There can be no doubt, under the record, that plaintiff first discovered the men who finally purchased the property; that he called their attention to the land, gave them maps of the field, and, finally, went over the ground with them.   Whether he notified Traer of that fact before Traer entered into personal negotiations with them is a matter in sharp dispute, but this question was for a jury.

Defendant also contends that the first negotiations with the purchasers were broken off, and that, several months thereafter, the matter was taken up by Osgood with some of the other officers of the purchasing company, resulting in an entirely new contract of sale.   This matter was not pleaded in answer, but, if it had been, the burden was upon the defendant to establish that fact, and the most that can be said is that there may have been a conflict on that proposition.   There are some things which tend to discredit plaintiff's testimony, but this was for the jury.   As said on the former appeal, there was enough testimony in the record to justify a verdict for plaintiff.

3. EVIDENCE: relevancy, materiality and competency: facts not in issue: interwoven transactions.

III. Testimony was adduced as to contracts made by plaintiff with various of the other coal companies involved in the case, whereby he was to receive a compensation for procuring and securing the extension of

options, and a commission for selling or finding purchasers for their coal lands. With a single exception, these arrangements were made with Traer, who was an officer of the corporations interested. That exception was a contract with Paul Morton as an officer of one of these companies. All this testimony was objected to, particularly that with reference to the arrangements made with Morton as an officer of one of the companies. The business of plaintiff with these several companies was continuous, and the testimony tends to show that it was the understanding between the parties, and expressly agreed between them at the time the contract is claimed to have been made with defendant, that the arrangements should continue the same as with other companies. Traer was also an officer of the company of which Morton was president. The record so ties these several matters together as to make relevant and material the arrangements which plaintiff had with each and all the companies, and there was no error in receiving this testimony. 3 Encyc. of Evidence, p. 524, and cases cited; *Livingston v. Stevens,* 122 Iowa 62; *Taylor v. Wildman,* 164 Iowa 252.

4. EVIDENCE: admissions: general managers and presidents.

IV.   Some letters from Traer to plaintiff, written in August of the year 1903, were received in evidence, over defendant's objections. These contained statements which, it might fairly be claimed, amounted to an admission by Traer that their relations were such that the company would be indebted to plaintiff for services performed and to be performed. As such, they were admissible, because they were made by defendant's president and manager with reference to certain deals then pending.

5. BROKERS: effecting sale: evidence.

V.   A letter from one Lee to a party by the name of Scholz, each of the parties being representatives of the party purchasing the lands, and the officers and agents of the company which purchased, who first examined and looked over the property,

was admitted in evidence over defendant's objections. The authenticity of the letter was established. This letter showed that, on October 28, 1903, Lee, the author, had gone over the property with plaintiff, the location of the property, etc., and that he, Seevers, wished to take the matter up with the company which finally purchased. He also made some comment on Seevers, the plaintiff, and enclosed a diagram showing the location of the property in question. One of the inquiries in the case was whether the purchasing party, through its agents, had knowledge of plaintiff's agency and dealt with him as such, and as to whether or not Seevers was responsible for finding these purchasers. Upon this question, the letter was material and competent, and constituted a part of the transaction which finally resulted in the sale—a verbal act which, when relevant, is admissible in evidence as part of the *res gestae.*

6. WITNESSES: impeachment: contradictory statements.

Moreover, the facts contained therein were not in dispute, save as Scholz testified that he had no knowledge of some of the facts recited in the letter, and had no knowledge of the location of the field which plaintiff was trying to sell. Even if not part of the *res gestae,* they were admissible for the purpose of contradicting Scholz, the man to whom the letter was addressed.

7. BROKERS: compensation: evidence: reasonable value of services: when inadmissible.

VI. Defendant offered to show by several witnesses the ordinary commission charged by real estate men in Lucas and Marion Counties for the sale of land, but the offer was rejected. In this there was no error. There was no dispute in the testimony as to the commission agreed upon if there was any contract at all, and the testimony shows, without conflict, that, in other contracts made by Traer with plaintiff for like work, it was agreed that plaintiff should have 5 per cent commission on the selling price. If a contract had been admitted by

defendant, and there had been a dispute as to the commission to be paid, doubtless the testimony offered should have been received, under the rule announced in *Roberts v. Roberts,* 91 Iowa 228, *Likes v. Baer,* 10 Iowa 89, *Sullivan v. Herrick,* 161 Iowa 148, and other like cases. But where, as here, the dispute is wholly over the making of any contract at all, and no question is raised as to the amount of commission to be paid in the event there was such contract, the rule of inadmissibility obtains. 2 Abbott's Trial Brief, p. 1347, Section 113; *Spurck v. Dean,* (Neb.) 68 N. W. 375; *Lewis v. Goldstein,* (N. J.) 68 Atl. 85; *Kidder v. Smith,* 34 Vt. 294; *Anderson v. Arpin Co.,* (Wis.) 110 N. W. 789–794; *Johnson v. Harder,* 45 Iowa 677; *Goin v. Hess,* 102 Iowa 140; *Oliver v. Morawetz,* (Wis.) 69 N. W. 977. So much for the rulings on testimony.

VII.  It is contended in argument that the verdict is contrary to certain instruc

**8. APPEAL AND ERROR: reservation of grounds of review: motion for new trial: specification of error.** tions given by the trial court, notably the 9th, 10th, 13th and 15th. We shall not set out these instructions, for it is sufficient to say that we find enough testimony in the record upon which to base them. Moreover, the defendant made no such point in its motion for a new trial. Its only ground which it can be claimed made the point is that the verdict is contrary to the evidence, is the result of passion and prejudice, and contrary to law. That this does not cover the point is held in *Cheney v. Stevens,* 173 Iowa 288; *Johnston v. Cedar Rapids & M. C. R. Co.,* 141 Iowa 114.

Moreover, the defendant asked instructions similar to those given, thus impliedly admit

**9. APPEAL AND ERROR: right of review: estoppel: requesting instructions.** ting that the questions were for the jury. *Spicer v. City,* 118 Iowa 561; *Gordon v. Chicago, R. I. & P. R. Co.,* 154 Iowa 449; *Carnego v. Crescent Coal Co.,* 163 Iowa 194; *Evans v. Roberts,* 172 Iowa 653.

VIII.   Instruction No. 8 is complained of because it omits an important element essential to plaintiff's recovery.   If the instruction attempted to cover the whole case, and were not a part of several instructions relating to the same subject-matter, there might be room for some complaint.   Construed, as it must be, with Nos. 11 and 12, there was no error; for in No. 12 the court expressly told the jury that, if Traer negotiated the sale with purchasers without knowledge that plaintiff had called the attention of the officers thereof to these lands, then he, plaintiff, could not recover.

*10. Trial: instructions: partial covering of case.*

It is not claimed that the instructions are conflicting; hence, the only question is: Taken as a whole, were they erroneous because they omitted this element of knowledge? We think not.

IX.   Defendant complains of the court's refusal to give certain instructions—among others, one known as No 1½. This related to the authority of Traer to employ the plaintiff.   We have already considered this matter in referring to the testimony, and find no error.

X.   It also complains of the court's refusal to give Instructions 23 and 24.   The first was properly refused be cause it stated that certain matters were proved, whereas they were in dispute.

The 24th reads as follows:

"If you find that said Traer held the title to the options and the lands purchased in trust for J. C. Osgood's personal use and benefit down to October 19, 1904, then you are instructed that it must be presumed that any offer by Traer, if any at all, prior to said time, of said options and lands for sale, and any authority he may have given anyone to find and produce a purchaser for the same, and any promise, if any at all, he may have made to pay a commis-

*11. Trial: instructions: applicability to evidence.*

sion for the finding and procuring of a purchaser, were for the personal benefit of said Osgood and not for the benefit of the Cleveland Coal Company, and that said Osgood, not the Cleveland Coal Company, would be liable for the commissions, if any had been contracted. And such presumption must prevail until fairly overcome by evidence produced before you."

The difficulty with this instruction lies in the fact that, while the title to the land was taken in the name of Traer, he at all times held the same in trust, not for Osgood, but for the defendant. The defendant treated the land as its own, with the knowledge of Osgood, undertook to sell it as such, and, finally, received the consideration therefor. Osgood never had title to the land, nor was the title taken in the name of Traer through mistake. Payments were made upon it by the defendant, and the most that can be said is that Osgood furnished some of the money with which to purchase it, for which he was given credit on the books of the Whitebreast Company to the land account of the defendant. This made him nothing more than a creditor of the company, with perhaps a lien upon the land for his advancements. He never held title thereto, either in trust or otherwise. It is true that the records of defendant show a purchase of the lands from Osgood in October of the year 1904, while the negotiations for the sale to the final purchasers were pending; but before they were concluded, and. Osgood had any record title to the lands, he participated in the negotiations for the sale thereof as an agent of the defendant company before the record entry of October, 1904; and the sale, as finally concluded, was by the Cleveland Company, although the deeds, or most of them, passed directly from Traer to the purchasing company. In view of these circumstances, the trial court did not err in refusing the 24th instruction.

Instruction No. 27, asked by the defendant and refused, reads as follows:

12. PRINCIPAL
AND AGENT:
authority of
agent: acts
and declara-
tions to
prove.

"You are instructed that the acts and declarations of Mr. Traer, alone and of themselves, are incompetent to prove his authority as president of defendant to bind defendant to pay a commission for plaintiff for finding and producing purchasers for defendant's lands, or any of them."

If there had been any claim that the case depended alone upon the acts and declarations of Traer, the instruction might well have been given, but we have no such case. We are at some loss to know just what thought the writer had in mind in phrasing this instruction. Of course, the authority of an agent cannot be proved by his own declaration: this is elementary law. But his acts alone, with the knowledge and consent of his principal, may have an important bearing upon his authority. But the instruction relates to his acts and declarations as president regarding his authority. He was, as we have seen by the record, something more than president. He was the general manager of the defendant, and the record shows that the Cleveland Coal Company and Osgood both determined to sell the land and authorized Traer to do so. Under this record, the giving of the instruction was likely to be confusing rather than helpful. Of course, as we have already said, agency cannot be proved by the acts and declarations of the agent himself. But, agency being shown, the extent of his authority may be shown by his acts and conduct, especially where known to, or the results thereof accepted by, the principal. Failure to give the instruction was not prejudicial, and the giving thereof would probably have led to confusion.

XI. But one question remains open, and that is the amount of the verdict. It is said to be excessive, because it is more than 5 per cent of the selling price. We are

satisfied that the record shows conclusively that the selling price of the land was $250,000, instead of $300,000, as claimed by plaintiff and evidently allowed by the jury, and that the verdict was rendered on an erroneous basis. It should be reduced $3,907.50, leaving the total amount due at the time the judgment was rendered, $18,337.25. Plaintiff may have judgment for this latter amount, with interest from the date of the verdict, or a new trial will be granted, election to be made within 20 days from the date of the filing of this opinion.—*Affirmed on condition.*

LADD, WEAVER and EVANS, JJ., concur.